KATES HOLDING CO., INC. (FORMERLY CRESTLINE INDUSTRIES CORPORATION, A CORPORATION OF THE COMMONWEALTH OF PENNSYLVANIA), PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4397–80.    Filed October 28, 1982.

*Robert B. Haines* and *Timothy Boderck,* for the petitioner.
*Andrew I. Panken* and *Patrick E. Whelan,* for the respondent.

SHIELDS, *Judge*: Respondent determined a liability in petitioner's Federal income taxes, due to its status as a transferee, in the amount of $49,016 for the taxable year ending June 30,

1974. Due to concessions by petitioner, the sole issue involved is whether petitioner's transferor qualified for a special deduction under section 922(a)[1] as a Western Hemisphere trade corporation. In particular, the issue is whether petitioner's transferor derived more than 95 percent of its gross income from "sources without the United States" within the meaning of section 921(1).

## FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioner Kates Holding Co., Inc., had its principal offices in Somerville, N.J., at the time it filed its petition herein. Kates Holding Co.; Inc., is the transferee of the assets of Federal International, Inc. (Federal).[2] Federal filed its Federal income tax return for the taxable year ending June 30, 1974, on or about December 17, 1974. At the time it filed its return, Federal had its offices at Two Penn Plaza in New York City.

During the year in issue, Federal sent steel to Jordan International Co., Inc. (Jordan). Federal invoiced Jordan for the steel. The invoices ae headed by the printed name "Federal Steel Corporation" under which is stamped "Federal International Inc." Two of the three invoices introduced into evidence bear the notation "F.O.B. Tioga Terminal"; the third invoice also bears the printed words "Ship To" followed by "Jordan International Co., Inc. c/o Tioga Terminal."

Jordan filled out order forms for the steel which it received from Federal.[3] These bear the notation "F.O.B. Tioga Terminal, Philadelphia." They also bear the printed word "Terms" followed by the typewritten phrase "½% 10 days, Net 30 Days." Below the printed terms "Purchased From," is typewritten:

---

[1] All section references are to the Internal Revenue Code of 1954 as amended during the year in issue, unless otherwise provided.

[2] Federal International, Inc., was liquidated into Crestline Industries. On Dec. 17, 1979, Crestline changed its name to Kates Holding Co., Inc.

[3] The evidence does not show whether Jordan sent these orders to Federal.

Federal Steel Company
Two Penn Plaza
New York, New York

A representative order form, reflecting the above terms, is reproduced on page 703.

Jordan shipped the steel it obtained from Federal to various Brazilian purchasers. Jordan invoiced the Brazilian purchasers for the steel that it shipped. The invoices for the steel had printed on them the word "Terms:" followed by a typewritten phrase such as "Letter of Credit Payable At Sight" or "Letter of Credit [or "L/C"] Payable Cash Against Documents." Each invoice also had typed upon it a phrase using the letters C. and F., such as "Total C and F Value," "Total C & F Liner Terms," "Total C & F Liner Terms Free Out," or "Total C & F Free Out Value." Two of the invoices state that the steel was "Shipped to:" Santos, Brazil, while the remainder indicate that the steel was "Shipped to:"

MS/VANDA—A LIBERIAN FLAG SHIP

LURIA BROS. & CO., INC., AS DISPONENT

MERCHANDISE IS IN ACCORDANCE WITH

IMPORT LICENSE NR. * * *

Each invoice bears the legend "This invoice represents the complete shipment against letter of credit # * * * as amended," which appears below the line containing the C. & F. term.

The prices listed on the invoices for each coil of steel shipped indicate that the steel was sent "FOB US $/MT [metric ton] Gross For Net." Another line, appearing beneath the price totals, reads "Ocean Freight U.S. $/MT," and is followed by a dollar amount. The line on which the total C. & F. terms are stated appears immediately below the lines listing the price of steel and the freight costs, and contains a dollar amount which equals the sum of the two preceding lines.

A representative invoice, reflecting the above terms, is reproduced on page 704.

Jordan shipped the steel to Brazil on the *Vanda*, a Liberian flagship, which it chartered from Philadelphia to Brazil. The master of the *Vanda*, by his agent, gave Jordan a bill of lading for each shipment. The bills of lading which were introduced into evidence state that the shipper was Jordan, and the port

# ORDER

CABLE ADDRESS
JORDANMILL, NEW HAVEN
TELEX 0963433

## JORDAN INTERNATIONAL COMPANY, INC.

2150 CHAPEL STREET ● NEW HAVEN, CONN. 06515 ● PHONE (203) 389-4577

Order No. _____ 101 _____

Purchased From:

Date: _____ August 3, 1973 _____

Federal Steel Company
Two Penn Plaza
New York, New York 10001

Terms: _____ ½% 10 Days, Net 30 Days _____

Shipment Date: _____

F.O.B. _____ Tioga Terminal—Philadelphia _____

Ship To:

F.O.B. TIOGA TERMINAL, PHILADELPHIA

Via: _____

Special Instructions: _____

_____

_____

_____

4,245,635 NET POUNDS COLD ROLLED STEEL COILS—COMMERCIAL QUALITY—CI008—DULL FIN-
ISH—OILED—SKIN PASSED—SLIT EDGE          I.D. 20/24"
ROCKWELL: B/55 Maximum
COIL WEIGHTS: 25,000 lbs. Maximum
MATERIAL MUST BE EXPORT WRAPPED
ORIGIN: JAPAN

| Item # | Net Pounds | Gauge & Size |
|--------|-----------|--------------|
| 1 | 106,000 | .017" × 39-⅜" |
| 2 | 1,071,926 | .059" × 24" |
| 3 | 870,140 | .028" × 37-⅞" |
| 4 | 386,846 | .017" × 36-⅝" |
| 5 | 393,791 | .034" × 42-¾" |
| 6 | 303,709 | .014" × 39-⅜" |
| 7 | 371,251 | .014" × 25-⁷/₁₆" |
| 8 | 115,000 | .014" × 37-¼" |
| 9 | 404,525 | .047" × 33-⅛" |
| 10 | 222,447 | .014" × 36" |

PRICE: $11.50 Per 100 lbs., F.O.B. Tioga Terminal, Philadelphia, Plus U.S. Extras.
  (Price is $11.20 Per 100 lbs., if Jordan
    does not receive duty drawback).

JORDAN INTERNATIONAL CO., INC.

(S)   Nathan Milikowsky
      NATHAN MILIKOWSKY, *President*

704

CABLE ADDRESS
JORDANMILL, NEW HAVEN
TELEX 0963433

# JORDAN INTERNATIONAL COMPANY, INC.

2150 CHAPEL STREET     P.O. BOX A     NEW HAVEN, CONNECTICUT 06515     PHONE  (203) 389-4577

Sold to:
SOCIEDADE INTERCONTINENTAL DE COMPRESSORES
HERMETICOS—SICOM S.A.
RUA CEL. J. AUGUSTO DE OLIVEIRA SALLES, 478
SAO CARLOS, SAO PAULO, BRAZIL

Shipped to:
NAME OF VESSEL: M/S VANDA—A LIBERIAN FLAG SHIP
VESSEL OWNER  : LURIA BROTHERS & CO., INC., AS DISPONENT
MERCHANDISE IS IN ACCORDANCE WITH
IMPORT LICENSE NR. 52-73/14014
ISSUED 10/2/73—EXPIRATION 3/31/74

INVOICE No.     572
DATE: DECEMBER 3, 1973
SALES ORDER No. JICI 101-C
PURCHASE ORDER No. _____
DATE SHIPPED _____
ETA: _____
TERMS: LETTER OF CREDIT PAYABLE
CASH AGAINST DOCUMENTS

| ITEM | COILS | GAUGE & SIZE | WEIGHT (NET LBS.) | PRICE PER CWT. | AMOUNT |
|------|-------|--------------|-------------------|----------------|--------|
|  |  |  | METRIC TONS | FOB US $/MT GROSS FOR NET |  |
|  |  | CHAPSA DE ACO LAMINADAS A FRIO EM BOBINAS RAO REVESTIDAS TIPO SAE 1008, I.D. 24/28″ |  |  |  |
| 1 | 13 | 0.43 × 930MM | 104.070 | $293.00 | $30,492.51 |
|  |  | OCEAN FREIGHT U.S. $/MT |  | 35.00 | 3,642.45 |
|  |  | TOTAL C & F LINER TERMS EFFECTIVE |  |  | $34,134.96 |
|  |  | THIS INVOICE REPRESENTS THE COMPLETE SHIPMENT AGAINST LETTER OF CREDIT # CI 1511202 AS AMENDED. |  |  |  |

JORDAN INTERNATIONAL COMPANY, INC.

_____
DANIEL MILIKOWSKY, VICE-PRESIDENT

CITY: NEW HAVEN
COUNTY: NEW HAVEN
STATE: CONNECTICUT

ON THIS 3RD DAY OF DECEMBER, 1973, PERSONALLY APPEARED BEFORE ME DANIEL MILIKOW-
SKY RESIDING AT 2150 CHAPEL ST., NEW HAVEN, CONN., PERSONALLY KNOWN TO ME, WHO
CERTIFIES THAT HE IS THE INDIVIDUAL WHO EXECUTED THIS INSTRUMENT.

_____
NOTARY

of loading was Philadelphia. Two of the bills of lading state that the port of discharge was Rio de Janeiro, while the remaining fifteen bills of lading state that it was Santos. Each bill of lading bears the legend "On Board" and, in reference to the packaged steel, "Atmospheric or surface rust on the outer packages, broken bands and small dents on packages, small tears in outer packaging." The bills of lading also state that the freight was "Prepaid."

During the year in issue, Daniel Milikowsky was the vice president of Jordan. Also at that time, Richard Kates was the president and 100-percent shareholder of Federal. Mr. Kates and Mr. Milikowsky testified that Federal and Jordan were engaged in a joint venture to sell steel to Brazilian purchasers. They stated that, pursuant to an oral agreement, Federal obtained the steel, and Jordan sold it to the Brazilians. Then, after recouping individual costs for obtaining and shipping the steel, Federal and Jordan equally split the profits. Mr. Milikowsky stated that if the Brazilians had rejected any of the steel shipments, Federal and Jordan would have been equally responsible. He also testified that Jordan insured the steel against the risk that the *Vanda* would sink before Jordan could collect on the Brazilian letters of credit.

## OPINION

Section 922 provides that a Western Hemisphere trade corporation is allowed a deduction in computing its taxable income. The deduction is determined as a specified fraction of the corporation's taxable income. Whether a corporation is entitled to a deduction under section 922 depends upon whether it is a "Western Hemisphere trade corporation." Section 921 defines a qualifying corporation as follows:

> For purposes of this subtitle, the term "Western Hemisphere trade corporation" means a domestic corporation all of whose business (other than incidental purchases) is done in any country or countries in North, Central, or South America, or in the West Indies, and which satisfies the following conditions:
>
> (1) if *95 percent or more of the gross income* of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period during which the corporation was in existence) *was derived from sources without the* United States; and
>
> (2) if 90 percent or more of its gross income for such period or such part thereof was derived from the active conduct of a trade or business.
>
> [Emphasis added.]

Respondent contends that Federal did not derive its gross income "from sources without the United States." He argues that Federal sold steel to Jordan in Philadelphia, and thus derived its income from sources *within* the United States. Petitioner claims that Federal and Jordan were engaged in the joint venture of selling steel to Brazil. Petitioner asserts that the sale to the Brazilian purchasers occurred in Brazil, which is outside the United States. Thus, petitioner insists that Federal was a Western Hemisphere trade corporation, as defined by section 921.

Respondent argues that even if Federal and Jordan were engaged in a joint venture, their sale of steel to the Brazilians occurred in Philadelphia. He contends that a sale occurs within the United States when title or risk of loss passes from seller to buyer within the United States. Respondent asserts that title to the steel and risk of loss passed from Jordan to the Brazilian purchasers when Jordan delivered steel to the *Vanda* in Philadelphia. Thus, he claims that any joint venture which may have existed between Federal and Jordan derived its income solely from sources within the United States. Accordingly, respondent insists that Federal did not qualify as a Western Hemisphere trade corporation during the years in issue. We agree.

For purposes of sections 921 and 922, the country in which personal property is sold is the "source" from which gain, profits, or income on the sale are derived. Secs. 1.921–1(c) and 1.861–7(a), Income Tax Regs. The regulations further specify:

a sale of personal property is consummated at the time when, and the place where, the rights, title, and interest of the seller in the property are transferred to the buyer. Where bare legal title is retained by the seller, the sale shall be deemed to have occurred at the time and place of passage to the buyer of beneficial ownership and the risk of loss. * * * [Sec. 1.861–7(c), Income Tax Regs.]

Thus, the country in which personal property is sold is the place where rights, title, and interest pass from seller to buyer, or under certain circumstances, where beneficial ownership and risk of loss pass from seller to buyer.

State law determines the passage of rights and interests between parties, while Federal law determines the effect of these rights and interests on income taxation. *Helvering v.*

*Stuart*, 317 U.S. 154 (1942); *Lyeth v. Hoey*, 305 U.S. 188 (1938). Neither respondent nor petitioner suggested which State law should be applied in this case for purposes of determining the passage of rights, title, and interest (or beneficial ownership and risk of loss) between Jordan and the Brazilian purchasers. We note that during the year in issue, Jordan had its principal offices in New Haven, Conn., Federal had its principal office in New York, N.Y., and the port of shipment was Philadelphia, Pa. The evidence does not show the place where the shipment contract was made. Under these facts, the question of choice of law is not a simple matter. However, both respondent and petitioner rely on the Uniform Commercial Code (U.C.C.) to support their arguments. Because the U.C.C. has been enacted in New York, Connecticut, and Pennsylvania,[4] and was so enacted during the year in issue, we will look to its provisions to determine the passage of title and risk of loss.[5]

The U.C.C., in article 2 relating to sales, has various sections on passage of title and risk of loss. The concept of title, as used in article 2, is no more than "bare legal title" such as is referred to in section 1.861–7(c), Income Tax Regs.[6] Under the U.C.C., the passage of rights, obligations, and risk of loss are determined independent of the passage of title. U.C.C. sec. 2–401. Thus, in interpreting section 1.861–7(a), Income Tax Regs., we will focus on the place where title to the goods and risk of loss pass from the seller to the buyer. See *Miami*

---

[4]Conn. Gen. Stat. Ann., tit. 42(a), secs. 42a–1–101 to 42a–10–104 (West 1960); N.Y. Uniform Commercial Code secs. 1–101 to 10–104 (McKinney 1964); 13 Pa. Cons. Stat. Ann. secs. 1101 to 9507 (Purdon 1982 Supp.).

[5]New York, Connecticut, and Pennsylvania have enacted versions of the U.C.C. which differ in minor detail. For instance, the Pennsylvania section defining C.I.F. and C. & F. terms states "the rights of the buyer," whereas the corresponding New York section states "the buyer's rights." The variations, insofar as they appear in sections discussed herein, are not substantive ones. However, for purposes of consistency and clarity, we will cite the language of the Pennsylvania enactment throughout our opinion.

[6]Professors G. Gilmore and C. Black discuss the art. 2 concept of "title" as follows:

Sec. 3–8. The most widely publicized innovation in the Code's recodification of sales law is that Article 2 abandons the touchstone of "property" as a criterion for determining the rights of the parties to the sales transaction. Obviously the "property" or "title" still has to be somewhere and its location will continue to determine such things as the incidence of property taxes. Thus, of necessity, Article 2 provides (in § 2–401) rules for determining where the "title" is, while sternly warning that the "rights, obligations and remedies" of seller and buyer are to be determined "irrespective of title to the goods."

G. Gilmore & C. Black, Law of Admiralty ch. 3, sec. 3–8 (2d ed.). This volume has been stipulated to by the parties as a learned treatise on mercantile sales law.

*Purchasing Service Corp. v. Commissioner,* 76 T.C. 818, 826 (1981).

In commercial sales, shifting risk of loss is governed by U.C.C. sec. 2–509, which provides that "Where the contract requires or authorizes the seller to ship the goods by carrier * * * risk of loss passes to the buyer when the goods are duly delivered to the carrier." The point of due delivery can be specified by the parties through the use of shipment terms such as F.O.B. (free on board), F.A.S. (free alongside), and C.I.F. (costs, insurance, and freight). The use of C. & F. (costs and freight) has the same meaning as C.I.F. except as regards the insurance obligation.

The effect of the C. & F. term is set forth under U.C.C. sec. 2–320.[7] It places the risk of loss on the buyer at the point where the seller puts the goods into the possession of a carrier at the port for shipment. It requires that the seller prepay the freight to the goods' destination. Thus, C. & F. means that the quoted selling price includes freight in addition to the goods' cost. (The C.I.F. term requires the seller to provide insurance on the goods payable to the buyer as well, which is also included in

---

[7]C.I.F. and C. & F. terms

(a) Definitions.—The term C.I.F. means that the price includes in a lump sum the cost of the goods and the insurance and freight to the named destination. The term C. & F. or C.F. means that the price so includes cost and freight to the named destination.

(b) Effect of C.I.F. destination term.—Unless otherwise agreed and even though used only in connection with the stated price and destination, the term C.I.F. destination or its equivalent requires the seller at his own expense and risk to do the following:

(1) Put the goods into the possession of a carrier at the port for shipment and obtain a negotiable bill or bills of lading covering the entire transportation to the named destination.

(2) Load the goods and obtain a receipt from the carrier (which may be contained in the bill of lading) showing that the freight has been paid or provided for.

(3) Obtain a policy or certificate of insurance, including any war risk insurance, of a kind and on terms then current at the port of shipment in the usual amount, in the currency of the contract, shown to cover the same goods covered by the bill of lading and providing for payment of loss to the order of the buyer or for the account of whom it may concern; but the seller may add to the price the amount of the premium for any such war risk insurance.

(4) Prepare an invoice of the goods and procure any other documents required to effect shipment or to comply with the contract.

(5) Forward and tender with commercial promptness all the documents in due form and with any indorsement necessary to perfect the rights of the buyer.

(c) Effect of C. & F. term.—Unless otherwise agreed the term C. & F. or its equivalent has the same effect and imposes upon the seller the same obligations and risks as a C.I.F. term except the obligations as to insurance.

(d) Tender of documents and payment.—Under the term C.I.F. or C. & F. unless otherwise agreed the buyer must make payment against tender of the required documents and the seller may not tender nor the buyer demand delivery of the goods in substitution for the documents.

the quoted price.) When the seller has satisfied the C. & F. requirements (see *supra* note 7), he must tender to the buyer the documents he has received from shipment, including the bill of lading, a receipt for prepaid freight, and an invoice for costs and freight. The buyer must make payment against these documents and cannot demand delivery of the goods instead. See U.C.C. sec. 2–320(d).

While the sales agreements between Jordan and the Brazilian purchasers were not introduced into evidence,[8] Jordan's invoices and the bills of lading were produced. These invoices all bear a C. & F. term next to a quoted price which equals the sum of the invoiced goods' price and the ocean freight price. The invoices show either that the steel was shipped to Brazil or that it was shipped via the *Vanda*. The bills of lading from the *Vanda* relating to these invoices show that the ship had Brazil as its port of destination and Philadelphia as its port of shipment. Thus, when the steel was shipped on the *Vanda*, it was headed for Brazil. The bills of lading also show that Jordan prepaid the *Vanda's* charge for freight.

Petitioner argues that the sale between Jordan and the Brazilian purchasers was not a C. & F. sale within the meaning of U.C.C. sec. 2–320. Although petitioner concedes that the letters "C & F" appear on Jordan's invoices, it nonetheless contends that Jordan was obligated to deliver the steel coils to Brazil, rather than to a carrier headed for Brazil. Accordingly, it concludes title and risk of loss passed to the Brazilians in Brazil, under U.C.C. sec. 2–401(2)(b) and 2–509(1)(b).

Petitioner supports its contention with two alternative arguments. First, it contends that the "C. & F." term has no meaning unless it is immediately followed by the name of a destination, such as "C. & F., Brazil," or "C. & F., Santos." It bases this claim on two phrases in U.C.C. sec. 2–320, which are: (1) "The term C. & F. or C.F. means that the price so includes cost and freight to the named destination"; and, (2) "the term C.I.F. [or C. & F.] destination or its equivalent requires the seller at his own expense and risk to * * * [deliver goods to a carrier, prepay freight, etc.]." Because there is no "named

---

[8]Jordan's business records had been moved into storage in an attic, and it was unable to locate those relating to the Brazilian sales.

destination" following C. & F. on Jordan's invoices, petitioner concludes that Jordan's agreement with the Brazilians was not a C. & F. contract.

We do not consider it relevant that "Brazil" or "Santos" does not appear immediately adjacent to the C. & F. term written on the invoice. We observe that U.C.C. sec. 2–320 does not categorically require the term "C. & F. destination," rather, it requires "the term C.I.F. [or C. & F.] destination *or its equivalent.*" Similarly, official comment 14 to U.C.C. sec. 2–320 states "the dominant outlines of the C.I.F. term are so well understood commercially that any variation should, whenever reasonably possible, be read as falling within those dominant outlines rather than as destroying the whole meaning of a term which essentially indicates a contract for proper shipment rather than one for delivery at destination." The invoices, together with the bills of lading, show that the steel coils were destined for Brazil. Moreover, they show that Jordan prepaid the freight charges to Brazil and billed the Brazilians for both the cost of the steel and the freight. Petitioner has not introduced any evidence tending to show that the actual sales agreement did not include a "C. & F. destination term," that the goods were actually destined for a place other than Brazil, or that the freight was not prepaid. In the absence of such evidence, we find that the letters "C. & F.," when appearing on papers connected with the sale which have somewhere upon them a notation of the goods' destination, show that the contract was for "C. & F.," the noted destination, within the meaning of U.C.C. sec. 2–320.

In the alternative, petitioner argues that Jordan and the Brazilians intended to create a destination contract and mistakenly, or improperly, used the C. & F. term. By a "destination" contract, petitioner means a contract under which Jordan was obligated to deliver steel to the Brazilians in Brazil, rather than delivering it to a carrier for transport to Brazil. Thus interpreting the contract, petitioner claims that risk of loss (U.C.C. sec. 2–509(1)(b)) and title (U.C.C. sec. 2–401(2)(b)) passed to the Brazilians when the steel coils were tendered upon arrival in Brazil,[9] and that the sale occurred in Brazil, accordingly.

---

[9] U.C.C. sec. 2–509(1)(b) reads:

(1) Where the contract requires or authorizes the seller to ship the goods by carrier

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

In support of this argument, petitioner first notes that Jordan insured the steel while it was aboard the *Vanda*. Petitioner interprets this arrangement as being inconsistent with a true C. & F. deal, wherein the seller prepays cost and freight and the buyer pays the insurance. However, Mr. Milikowsky's testimony, on which petitioner relies, shows that Jordan's insurance arrangement was undertaken consistent with C. & F. terms. Mr. Milikowsky, who was vice president of Jordan when the questioned trading with Brazil occurred, testified that the Brazilians were required, under Brazilian law, to insure the voyage. He stated that Jordan supplied its own insurance in the event that the *Vanda* sank before Jordan could tender to the purchasers the bills of lading and other necessary documents and thereby collect on the purchasers' letters of credit. Thus, the insurance undertaken by Jordan was not for the benefit of the Brazilian purchasers, but instead protected Jordan against potential rejection of documents tendered for collection on the letters of credit.[10] Jordan's insurance of the steel aboard the *Vanda*, for its own benefit, did not conflict with C. & F. terms, wherein the purchaser provides its own insurance on the goods, and the seller is entitled to payment against documentary tender. U.C.C. secs. 2–320(3) and 2–320(4).

Petitioner next argues that risk of loss of the steel remained on Jordan until the steel was delivered to Brazil because Jordan chartered an entire ship to deliver the steel. Petitioner contends that because Jordan chartered the *Vanda*, the *Vanda* was Jordan's agent. From this, petitioner concludes

---

(b) if it does require him to deliver them at a particular destination and the goods are there duly tendered while in the possession of the carrier, the risk of loss passes to the buyer when the goods are there duly so tendered as to enable the buyer to take delivery.

U.C.C. sec. 2–401(2)(b) reads:

(b) if the contract requires delivery at destination, title passes on tender there.

[10]Professors Gilmore and Black observe, "at a time of sharp market breaks, a bank officer who cannot, at his customer's request, discover some plausible reason for dishonoring drafts [on the customer's letter of credit after the seller has tendered the necessary documents] is hardly worthy of the name." G. Gilmore & C. Black, *supra* note 5, at 121. It is reasonable that the sinking of a ship might constitute a sharp market break such as those contemplated in the above-noted quote.

that Jordan controlled the *Vanda* until it reached its port of destination.

Petitioner has confused facts with their legal effects. Whether the *Vanda* was subject to Jordan's control is a fact which must be determined before the legal conclusion that the *Vanda* was Jordan's agent can be reached.[11] Jordan's chartering of the *Vanda* does not constitute control. The *Vanda* (by its master and owner) was an independent contracting party. It offered to transport steel for hire and was thus a carrier.[12] The bills of lading given to Jordan by the master of the *Vanda* served both as receipts for the goods delivered on board, and as contracts, evidencing the *Vanda's* obligation to transport.[13] Moreover, Jordan was obligated to deliver documents, not steel, to the Brazilians, so the *Vanda's* delivery of the steel was not performance of what Jordan would otherwise have been obligated to do. Under these circumstances, the *Vanda* was not controlled by Jordan. See note 11 *supra*. Thus, the *Vanda* was not Jordan's agent.[14]

Finally, petitioner asserts that because the Brazilians had the right to inspect and reject the steel, their agreement with Jordan was a destination contract. Petitioner quotes U.C.C. sec. 2–320, official comment 1, "The buyer [on a C. & F. contract] has no right of inspection prior to payment or acceptance of the documents" and concludes that the agreement could not have been a C. & F. contract since Federal and Jordan would have shared equally any losses from a purchaser's rejection. Petitioner ignores the significance of the clause "prior to payment *or* acceptance of the documents." There is nothing in the record to indicate that the Brazilians could inspect and reject the goods *prior to payment*. Instead, the Brazilians could inspect the goods only after they had posses-

---

[11]An agency relationship is a fiduciary relationship whereby the agent agrees to act on behalf of, and subject to the control of, his principal. For State law citations, see 3 Am. Jur. 2d, Agency sec. 2 (1962).

[12]The U.C.C. does not define carrier. However, general understanding of the term is of one who transports (or "carries") persons or property for hire. Such a carrier may be common or private. For State law citations, see 13 Am. Jur. 2d, sec. 3 (1962).

[13]See, e.g., *Northern Pacific Railway Co. v. Wall*, 241 U.S. 87, 92 (1916); *Louisville & Nashville Railroad Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 67 (1924).

[14]We do not reach the issue whether, if the *Vanda* had been Jordan's agent, risk of loss under the U.C.C. would have remained on Jordan after it delivered steel to the *Vanda* in Philadelphia.

sion of Jordan's bill of lading. They could only receive this document, as well as any others constituting part of the documentary sale, if they paid for it. Moreover, from the facts, it is apparent that the sales between Jordan and the Brazilians were by letter of credit. The invoices state that the steel was shipped against a letter of credit and that the terms of the deal were "L/C payable cash against document." Mr. Milikowsky's testimony confirms these terms. A letter of credit sale is a documentary sale whereby a bank pays drafts on its customer's account upon presentation of documents specified in the letter of credit.[15] These facts indicate that the Brazilians had no right to inspect the steel prior to payment, which is consistent with a C. & F. contract. See U.C.C. sec. 2–320, official comment 1.

The arguments presented by petitioner do not convince us that the agreements between Jordan and the Brazilians were other than C. & F. agreements. We conclude that Jordan shipped the steel coils to Brazil under a C. & F. contract. Thus, title (see U.C.C. sec. 2–401) and risk of loss (see U.C.C. sec. 2–509) passed from Jordan to the Brazilian purchasers when Jordan delivered the coils to the master of the *Vanda* and received in return a bill of lading and receipt for prepaid freight. This delivery occurred in Philadelphia. Even if Jordan and Federal were engaged in a joint venture, all income which Federal received therefrom was derived from sources within the United States. Therefore, we conclude that Federal was not a Western Hemisphere trade corporation during the year in issue. Accordingly, it was not entitled to a deduction as a Western Hemisphere trade corporation under section 922. Respondent's determination on this issue is sustained.

To reflect concessions and the foregoing,

*Decision will be entered for the respondent.*

---

[15]See G. Gilmore & C. Black, *supra* note 5, at 120–124.