WILLIAM B. STEIN, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stein v. Commissioner
Docket No. 14227-86
United States Tax Court
T.C. Memo 1989-489; 1989 Tax Ct. Memo LEXIS 492; 58 T.C.M. (CCH) 85; T.C.M. (RIA) 89489; September 7, 1989
William Randolph Klein, for the petitioner. Steve R. Johnson, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent issued a notice of deficiency and determined that petitioner owed $ 38,265 in Federal income tax for 1980. The issue for decision is whether petitioner realized short-term or long-term capital gain from a transaction relating to commodity futures contracts. A statute of limitations issue initially was raised by petitioner but was abandoned on brief. FINDINGS OF FACT Some of the facts have been stipulated and are so found. At the time the petition was filed, petitioner resided in Venice, Florida. In 1978 through 1980, petitioner participated in a Supervised Commodity Trading Program ("SCTP") with Shearson Hayden Stone, Inc. ("Shearson"). Under the SCTP program, petitioner authorized Shearson to act as his agent in *494 buying, selling, and trading commodities and commodity futures contracts. From the record before us it is not possible to identify the exact number and nature of each of the commodity futures contracts petitioner entered into or the amount of petitioner's gains and losses associated with each transaction. On petitioner's 1980 Federal income tax return, only net gain and net loss figures from the various transactions in which petitioner purchased silver and silver futures contracts were reported. Other documentary evidence and the stipulation of facts concerning the transactions are not complete, and the parties use different numbers and describe various aspects of the transactions inconsistently in their briefs. We summarize below, as we understand them, the essential relevant facts. On June 22, 1979, petitioner, through his SCTP account, purchased a long commodity futures contract entitling him to receive 5,190.18 ounces (5 bars) of silver in January of 1980 through the Commodity Exchange ("COMEX") in New York City. The price for the silver reflected by petitioner's long position was $ 9.2660 per ounce or a total price of $ 46,310. In December of 1979, Shearson was notified *495 by COMEX that a number of holders of short positions in January-1980 silver futures contracts decided to make delivery of the actual silver. Pursuant to the rules of COMEX and the terms of the SCTP trading program, Shearson allocated these silver delivery orders to the participants in the SCTP program that had held January-1980 long silver futures contracts for the longest period of time. Petitioner's January-1980 long silver contract was among the longest held, and one of the delivery orders was allocated to his long position. On December 28, 1979, Shearson notified petitioner through a delivery invoice that his long position would be terminated by delivery of the silver on January 2, 1980, and Shearson advised petitioner of the warehouse receipt number associated with the silver. On January 2, 1980, Shearson, on behalf of petitioner, apparently received a warehouse receipt for the silver, which at all times relevant to this transaction remained stored at Citibank offices in New York City. After January 2, 1980, petitioner had the right to take physical possession of the silver. Shearson charged petitioner the $ 46,310 stated price for the silver under petitioner's futures contract *496 and for storage expenses associated with the silver. On January 2, 1980, Shearson also took steps, on petitioner's behalf, to sell the silver by entering into a short position to deliver 5,190.18 ounces of January-1980 silver, and Shearson apparently issued a delivery notice to COMEX with respect to the silver. The silver was sold on petitioner's behalf on January 7, 1980, when a warehouse receipt transferring ownership was issued, and constructive delivery was effected on January 9, 1980. Petitioner's silver was sold for $ 187,362. Petitioner realized a net gain after costs of approximately $ 135,500 from this transaction (sales price of $ 187,362, less petitioner's purchase price of $ 46,310, less additional costs, apparently equaled $ 135,500). Petitioner reflected this transaction (along with another sale that produced a loss) on his 1980 Federal income tax return as a sale of "silver," but petitioner treated it as qualifying for long-term capital gain as if he had sold (or offset) the June-1979 long futures contract, in lieu of having sold the silver itself. Shearson, on petitioner's behalf and apparently in order to "lock in" petitioner's gain from the first transaction, *497 on January 2, 1980, entered into another short position in a January-1980 silver futures contract. Shearson terminated this short position on January 9, 1980 by the purchase on that date of an offsetting long position. Petitioner realized a short-term loss of approximately $ 35,500 from the termination of this contract. Petitioner, on his 1980 Federal income tax return, netted the approximate $ 35,500 short-term loss against the reported $ 135,500 long-term gain, resulting in the reported net long-term capital gain from these two transactions of $ 100,115. Upon audit, respondent treated the $ 135,500 net gain from the first transaction as a short-term capital gain, taxable at ordinary income (not long-term capital gain) rates, and respondent determined the deficiency at issue. OPINION In 1980, a commodity futures contract, for Federal income tax purposes, was treated as an executory contract, in which the person initiating the contract acquired "either the right and obligation to purchase the underlying commodity in the future (a long position) or the right and obligation to sell the *498 underlying commodity in the future (a short position), in each case, at a fixed price." New Mexico Timber Co. v. Commissioner, 84 T.C. 1290, 1300 (1985); Modesto Dry Yard, Inc. v. Commissioner, 14 T.C. 374, 385 (1950). Delivery of a commodity upon termination of a futures contract was not a taxable event. [1] The taxable event occurred when the actual commodity was subsequently sold. The purchase, however, of a commodity futures contract offsetting another commodity futures contract was treated as a taxable event, since the offset resulted in the receipt of cash or the realization of an immediate gain or loss. New Mexico Timber Co. v. Commissioner, supra at 1301; Vickers v. Commissioner, 80 T.C. 394, 409 (1983); Covington v. Commissioner, 42 B.T.A. 601, 606 (1940), affd. in part and revd. in part 120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942). *499 The dispute in this case revolves around the different long-term capital gain holding periods applicable to commodity futures contracts, on the one hand, and to actual commodities, on the other. In 1980, the holding period required in order to qualify the purchase and sale of commodity futures contracts for long-term capital gain treatment was six months. See flush language of section 1222 that follows section 1222(11), as in effect in 1980. [2] The holding period required in order to qualify the purchase and sale of actual commodities for long-term capital gain treatment was one year. Sec. 1222(3). If, as occurred in this case, a commodity futures contract resulted in the acquisition of the actual commodity, the holding period of the commodity futures contract would be tacked on to the holding period of the actual commodity to determine the total holding period. Sec. 1223(8). Petitioner argues that the substance of the transaction before us requires *500 that petitioner be regarded as having purchased, on January 2, 1980, a short position in January-1980 silver that offset the commodity futures long position in January-1980 silver that petitioner had purchased in June of 1979. Accordingly, petitioner believes the six-month holding period applicable to commodity futures contracts is controlling and was satisfied. Respondent contends that petitioner's long position was terminated on January 2, 1980, when Shearson, on petitioner's behalf, constructively took delivery of the 5,190.18 ounces of silver, and that the taxable event which triggered petitioner's realization of the gain associated with the transaction was petitioner's sale of the actual silver on January 7, 1980. Accordingly, respondent argues that the one-year holding period applicable to the sale of actual commodities is controlling and was not satisfied. We agree with respondent. State law determines when property rights transfer between individuals, while the Internal Revenue Code determines the Federal tax consequences of the transfer. Helvering v. Stuart, 317 U.S. 154, 161-162 (1942). *501 However, neither petitioner nor respondent suggest which state law should govern the transaction at issue. Since both petitioner and respondent rely on the Uniform Commercial Code ("UCC") in discussing the transfer of property rights in a commodity futures transaction, and since the states where the transaction occurred, where petitioner's broker did business, and where petitioner resided when the transaction occurred (namely, New York and Ohio) have adopted the UCC, we will consider the UCC to be the controlling state law, and we will cite to the New York codification thereof. Kates Holding Co. v. Commissioner, 79 T.C. 700, 707 (1982). Under N.Y. Uniform Commercial Code Law sec. 2-401 (McKinney, 1964), the transfer of property rights in a sales transaction generally is determined independently from the passage of title except where applicable provisions of Article 2 make title transfer controlling. Further, we look beyond bare legal title in determining whether a taxpayer is to be recognized as the owner of property for Federal tax purposes. It is the right to beneficial *502 enjoyment of property and not the actual exercise of this right, that is generally determinative of ownership. Skripak v. Commissioner, 84 T.C. 285, 316 (1985). See also Corliss v. Bowers, 281 U.S. 376, 378 (1930). That petitioner on January 2, 1980, acquired rights of ownership in the 5,190.18 ounces of silver, even though he did not personally receive a warehouse receipt for the silver, is obvious from the record. The warehouse receipt and delivery notice evidencing these rights were delivered to Shearson as petitioner's agent on or before January 2, 1980, and petitioner was notified thereof. On that date, petitioner was entitled to possession of the silver, and he paid the costs associated with the storage of the silver by Citibank from that date until January 7, 1980, when the silver was sold by Shearson on behalf of petitioner. Petitioner emphasizes that neither he nor Shearson ever had actual possession of the silver and that he never personally received a warehouse receipt with respect to the silver. Petitioner therefore argues that he never acquired actual ownership of the silver. However, *503 under N.Y. Uniform Commercial Code Law sec. 2-503(4)(a) (McKinney, 1964) (applicable where goods are in the possession of a bailee and are to be delivered without being moved), a seller tenders delivery when the seller tenders a negotiable document of title covering the goods or when the seller procures acknowledgement by the bailee of the buyer's right to possession of the goods. Under N.Y. Uniform Commercial Code Law sec. 1-205(2) (McKinney, 1964), "usage of trade" may be considered in analyzing a sales contract. In commodity markets, the termination of commodity futures contracts by "delivery" of the underlying commodity is accomplished by notification of delivery and by delivery of the warehouse receipt to the buyer or his broker in exchange for payment. Kaufman, Handbook of Futures Markets 3-15 (1984). The warehouse receipt represents constructive delivery of the physical commodity, which commodity invariably remains in an approved storage location. Kaufman, supra at 3-9 through 3-15. Petitioner argues that the January 2, 1980, purchase *504 of the silver by petitioner should be disregarded, and that the January 2, 1980, transaction should be regarded as a mere offset of the June 22, 1979, long transaction, because it was his intention to derive long-term capital gain from the investment. Petitioner's intention, however, to derive long-term capital gain from the transaction is inadequate to satisfy the long-term capital gain holding period. Petitioner (and Shearson on petitioner's behalf) held the long position in January-1980 silver futures into the delivery period. Having done so, petitioner accepted the risk that delivery orders would be issued by sellers of January-1980 silver, and petitioner was subject to the rules and procedures of COMEX and Shearson for allocating delivery orders among its customers. The general rules and procedures of commodity futures transactions, which explain the transaction before us, are described in Kaufman, supra 3-9 through 3-10, as follows: Most buyers and sellers of futures contracts ultimately offset their original position by taking an opposite position in the futures market so that, by the principle of substitution, they terminate their contract obligations. However, *505 some small percentage of futures contracts are settled by delivery of the physical commodity against the contract. Although the clearinghouse does not make or take delivery itself, it establishes the mechanism and sets the procedures by which deliveries are made. Through substitution, the clearinghouse matches up a short who wishes to make delivery with a long contract holder who wishes to receive delivery; on most exchanges this delivery is directed to the eligible long who has held his or her futures contract the longest. Of course, the clearinghouse deals with the ultimate receiver only through the member firm which represents him or her, and the member firm may have its own internal methods for selecting the long, from the firm's list of clients who are long, to whom they will pass delivery. * * *
Once the clearinghouse has received a delivery notice it passes it along to a clearing member who is shown on the books as being long and eligible for delivery. Each clearinghouse has its own rules and procedures for selecting which member firm will receive the notice if more than one is an eligible long. In most cases, the first notice is given to the firm holding the oldest long *506 position; however, some exchanges distribute delivery notices in proportion to the relative numbers of long contracts held by the various members. When a long receives a delivery notice, the long must accept it regardless of his or her ultimate intention not to accept delivery. * * * On the facts before us, we conclude that petitioner received delivery and ownership of the 5,190.18 ounces of silver on January 2, 1980, and that he sold the silver on January 7, 1980. Accordingly, the one-year capital gain holding period applicable to the sale of commodities (as distinguished from the six-month holding period applicable to the sale of commodity futures contracts) is applicable. Petitioner's holding period for the silver futures contract (June 22, 1979 - January 2, 1980) is to be tacked on to his holding period for the actual silver (January 2, 1980 - January 7, 1980). Petitioner's total holding period of approximately seven months fails to satisfy the one-year capital gain holding period applicable to the sale of commodities, and petitioner's capital gain on this transaction is to be treated as short-term. Decision will be entered under Rule 155. Footnotes
1. Section 1256(c), of the Internal Revenue Code of 1954↩, as enacted by the Economic Recovery Tax Act of 1981, Pub. L. 97-34, sec. 503(a), 95 Stat. 327, made delivery of the commodity a taxable event for commodity futures contracts established or property acquired after June 23, 1981.
2. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as in effect for the year at issue.↩