NEW MEXICO TIMBER COMPANY, A NEW MEXICO CORPORATION, T. P. GALLAGHER AND BARBARA GALLAGHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 24199-82.     Filed June 17, 1985.

*John S. Campbell,* for the petitioners.
*James E. Polk,* for the respondent.

KÖRNER, *Judge:* Respondent determined deficiencies in Federal income tax against petitioners as follows:

---

[6]Sec. 1202 provides that 60 percent of the amount of a taxpayer's net capital gain shall be deducted from gross income.

| Petitioner | TYE | Deficiency |
|---|---|---|
| New Mexico Timber Co. | Apr. 30, 1979 | $62,055 |
| | Apr. 30, 1980 | 46,420 |
| | Apr. 30, 1981 | 56,323 |
| Total | | 164,798 |
| T.P. Gallagher | Dec. 31, 1979 | 18,662 |
| and Barbara Gallagher | Dec. 31, 1980 | 75,017 |
| Total | | 93,679 |

The only issue for us to decide is whether the amount of "gross receipts," within the meaning of section 1372(e)(5),[1] realized by a small business corporation trading in commodity futures contracts, equals the total amount realized, or whether such receipts are taken into account only to the extent of the gains from such transactions, unreduced by any fees or commissions.

This case was submitted to the Court under the provisions of Rule 122, upon a set of stipulated facts and exhibits. The stipulation of facts, supplemental stipulation of facts, and joint exhibits attached thereto are incorporated herein by this reference and form the basis of our findings of fact.

### FINDINGS OF FACT

New Mexico Timber Co. (hereinafter NMT) was, during the years in issue, a New Mexico corporation, with principal offices in Albuquerque, New Mexico.

T.P. Gallagher (hereinafter T.P.) and Barbara Gallagher were husband and wife and residents of Albuquerque, New Mexico, at the time the petition herein was filed. T.P. was the sole shareholder, president, and chief executive officer of NMT at all times material hereto.

In 1959, T.P. purchased 100,000 acres of standing timber in the Valle Grande in Sandoval County, New Mexico (hereinafter the Baca location) and 116,000 acres of standing timber in Sandoval County, New Mexico, in the San Diego Land Grant (hereinafter the San Diego location). T.P. also purchased a saw

---

[1]All statutory references are to the Internal Revenue Code of 1954 as in effect in the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted. The provisions of the Subchapter S Revision Act of 1982, Pub. L. 97–354, 96 Stat. 1669, as amended by the Technical Corrections Act of 1982, Pub. L. 97–448, 96 Stat. 2365, and the Deficit Reduction Act of 1984, Pub. L. 98–369, 98 Stat. 494, are not retroactive and are inapplicable to the facts herein.

mill, logging equipment, a planing mill, dry kilns, and other equipment used in the production of lumber, the inventory and receivables of NEMTICO, INC., and a tract of real property located in Bernalillo, Sandoval County, New Mexico (hereinafter the Bernalillo land). The timber and the other assets were then transferred to NMT's predecessor,[2] of which T.P. was the sole shareholder, and later to NMT. The latter was engaged in various activities, including the sale of standing timber, lumber manufacturing, and the wholesale purchase and sale of manufactured timber. NMT acquired equipment and other operating assets, from time to time, in connection with its various businesses.

In 1963, NMT sold the San Diego location. The Baca location was sold, in a transaction qualifying for reporting under the installment method of section 453, in 1972; the last installment payment was received by NMT in June 1981.

NMT decided to cease its lumber business and to liquidate the equipment on May 1, 1976. As of May 1, 1976, and at all times until April 30, 1978, NMT was an electing small business corporation. No voluntary revocation of NMT's small business corporation election was filed by its shareholders during the years in issue.

In November 1978, NMT sold the Bernalillo land in a transaction qualifying for the installment method of reporting of section 453.

Between 1976 and 1979, T.P. discussed the possibility of liquidating and dissolving NMT with his accountants. T.P. was advised that a liquidation would have unfavorable income tax consequences resulting from the disposition of the installment obligations received by NMT in the sale of the Baca location and the Bernalillo land, pursuant to the provisions of section 453(d). T.P. was also advised that in order for NMT to avoid the automatic termination provisions of section 1372(e)(5) and retain its status as an electing small business corporation, its gross receipts from passive income sources, viz, royalties, dividends, interest, and gains from the sales or exchanges of stock or securities, had to be less than 20 percent of its gross receipts. Gross receipts from passive investment income sources did not equal or exceed 20 percent of total gross

[2]All references to NMT include its predecessor.

receipts of NMT during its taxable years 1976 through April 30, 1978.

In 1978, NMT was approached by Hanseatic Commodities Advisors (hereinafter Hanseatic), a commodity futures consulting firm, concerning trading in commodity futures. NMT decided to attempt to make profits by trading in commodity futures contracts.

A commodity futures contract is a firm commitment to deliver or to receive a specified quantity and grade of a commodity during a designated month in the future (the delivery month) at a specified price. All the terms and provisions of a futures contract are fixed by the bylaws and rules of the commodity exchange on which the contract is traded, except for the price and the delivery month, which are agreed upon at the time a trade is made on the floor of the exchange. A person entering into a commodity futures contract to sell a commodity, viz, to deliver the commodity, is obligated to deliver the commodity in the delivery month, unless he has disposed of the contract in the meantime; this is known as taking a "short position." A person buying a commodity futures contract to purchase a commodity, viz, to accept delivery of the commodity, is obligated to accept delivery of the commodity in the delivery month and pay for the commodity at the specified contract price, unless he has disposed of the contract in the meantime, although his liability for the payment of such money on any day before the delivery date is limited to the margin call on that particular day;[3] this is known as taking a "long position." If the price of the underlying commodity falls, the trader must either satisfy the margin call requirements or liquidate his position at a loss.

The holders of both long and short positions can close out their contracts, without making or taking delivery of the commodity, by entering into offsetting purchases or sales of futures contracts on the exchange.[4] Pursuant to the rules of the various exchanges, the offsetting purchase or sale cancels the obligation to accept or deliver the underlying commodity. Thus, the holder of a long commodity futures contract can cancel or offset his obligation to purchase and pay for the

[3] See note 5 infra.
[4] Holders of commodity futures contracts can only close out their positions by delivery or offset; they cannot transfer them to third parties.

commodity by acquiring from another the promise to purchase and pay for the same commodity on the same exchange for the same delivery month, that is, by entering into an offsetting short contract, and vice versa.

NMT established a commodities futures trading account with Merrill Lynch Pierce Fenner & Smith, Inc. (hereinafter Merrill Lynch), a brokerage firm, pursuant to the terms of a commodity account agreement. Under the terms of the afore-said agreement, NMT agreed that:

(a) Any and all transactions would be subject to the constitution, rules and regulations, customs and usages of the exchange or market where any transaction was to be executed;

(b) Any and all securities or commodities or contracts relating thereto, held by Merrill Lynch, were to be held as security for the payment of any of NMT's liabilities to Merrill Lynch;

(c) Merrill Lynch would have the right, whenever in its discretion it considered it necessary for its protection, to sell any of the commodities or contracts related thereto or to close out any standing commodities or contracts related thereto on the open market or on any exchange, without notice, demand, or advertisement;

(d) NMT would be at all times liable for deficiencies remaining in its account after sales by Merrill Lynch or NMT.

NMT also executed a power of attorney constituting and appointing Hanseatic as NMT's agent for the purpose of buying, selling, and trading in commodities. As a condition for buying, selling, and trading in commodities, Merrill Lynch required that NMT deposit $100,000 in cash with it. This was a margin[5] requirement to protect Merrill Lynch and the various com-modity exchanges from losses in NMT's commodities account.[6] NMT opened a Ready Assets account with Merrill Lynch, with an initial deposit of $100,000. NMT authorized Merrill Lynch,

---

[5]Margin is the amount of money or collateral deposited by a client with the broker for the purpose of insuring the broker against loss on open futures contracts; it is not a part payment on a purchase, and does not represent a loan. If a customer's "equity" in any futures contract drops to or under a specified percentage of the original margin (the equity percentage) the broker must issue a margin call (variation margin) to restore the equity percentage. Equity is the residual dollar value of a customer's total futures trading account assuming it were liquidated at current market prices.

[6]Pursuant to the rules of the various commodity exchanges, the broker effecting orders is primarily responsible to the various commodity exchanges for the trading losses of its customers.

in writing, to transfer funds from its Ready Assets account to its commodity account.

During its taxable year ended April 30, 1979, NMT, acting as a commodities trader, effected a number of futures transactions in commodities that included lumber, gold, hogs, copper, sugar, soybean oil, silver, soybeans, cotton, wheat, foreign currency, and cattle. NMT entered into commodities futures contracts with an aggregate cost price of $880,882. In order to close its positions, NMT entered into offsetting commodity futures contracts with respect to the same underlying commodities in the same delivery months with an aggregate selling price of $909,471.60. NMT realized total gains, before fees or commissions, of $28,590 from its commodity futures transactions. NMT did not engage in any straddle transactions.[7] At no time during its taxable year ended on April 30, 1979, did NMT have possession, nor did it take delivery of, any underlying commodities in connection with its commodity futures transactions.

For each transaction entered into by NMT, Merrill Lynch issued a transaction statement describing the transaction and setting forth the type of underlying commodity, the number of contracts purchased or sold, the selling price or cost of the underlying commodity (per contract unit), and the delivery month.

The chart on pages 1296–1297 reflects the delivery date, description, date of purchase, date of sale, selling price, cost, and gain or loss on the commodity futures transactions entered into by NMT during its taxable year ended April 30, 1979.

---

[7]A commodity straddle is defined as the simultaneous holding of a long position in one delivery month and a short position in another delivery month. The long position and the short position are commonly referred to as the "legs" of the straddle. A straddle may be achieved in one or two ways: (1) By trading each leg separately, or (2) by taking both positions in one simultaneous transaction. Outright long or short positions in commodity futures are much more risky than straddle positions. The risk in an outright position is that the price of the underlying commodity will rise or fall. In a straddle position, the risk (potential for profit or loss) is that the spread or difference between the prices of the two legs of the straddle will widen or narrow; the general trend of the price of the underlying commodity is of no serious economic importance.

| Delivery date | Description | Date purchased | Date sold | Selling price[8] | Cost[9] | Gain or (loss)[10] |
|---|---|---|---|---|---|---|
| 8/78 | Jan. 1979, Soybeans | 8/14/78 | 8/28/78 | $32,050.00 | $31,525.00 | $525.00 |
| 8/78 | Dec. 1978, SB Meal | 8/15/78 | 8/29/78 | 16,850.00 | 16,650.00 | 200.00 |
| 8/78 | Dec. 1978, Cattle new | 8/25/78 | 9/15/78 | 22,750.00 | 21,760.00 | 990.00 |
| 8/78 | Dec. 1978, Cattle new | 8/25/78 | 9/15/78 | 22,750.00 | 21,830.00 | 920.00 |
| 8/78 | Mar. 1979, Wheat | 8/24/78 | 10/20/78 | 16,987.50 | 16,487.50 | 500.00 |
| 8/78 | Mar. 1979, Wheat | 8/24/78 | 10/20/78 | 16,987.50 | 16,375.00 | 612.50 |
| 8/78 | Dec. 1978, Hogs | 8/25/78 | 9/20/78 | 15,000.00 | 14,257.50 | 742.50 |
| 8/78 | Dec. 1978, Hogs | 8/25/78 | 9/20/78 | 15,015.00 | 14,400.00 | 615.00 |
| 8/78 | Mar. 1979, Sugar II | 8/31/78 | 10/31/78 | 10,505.60 | 9,072.00 | 1,433.60 |
| 9/78 | Dec. 1978, Copper | 9/18/78 | 10/16/78 | 16,750.00 | 16,650.00 | 100.00 |
| 9/78 | Dec. 1978, Deutsche marks | 9/18/78 | 10/31/78 | 72,050.00 | 64,325.00 | 7,725.00 |
| 9/78 | Dec. 1978, IMM gold | 9/20/78 | 10/20/78 | 22,980.00 | 21,910.00 | 1,070.00 |
| 9/78 | Dec. 1978, IMM gold | 9/20/78 | 10/20/78 | 22,980.00 | 21,800.00 | 1,180.00 |
| 9/78 | Dec. 1978, Swiss francs | 9/25/78 | 9/26/78 | 85,850.00 | 85,000.00 | 850.00 |
| 9/78 | Dec. 1978, Canadian oil | 10/04/78 | 9/28/78 | 84,850.00 | 84,640.00 | 210.00 |

(Footnotes appear at end of table.)

| Delivery date | Description | Date purchased | Date sold | Selling price | Cost | Gain or (loss) |
|---|---|---|---|---|---|---|
| 10/78 | Mar. 1979, Corn | 10/02/78 | 11/01/78 | 47,400.00 | 47,250.00 | 150.00 |
| 10/78 | Dec. 1978, Cotton | 10/03/78 | 11/01/78 | 33,700.00 | 33,060.00 | 640.00 |
| 10/78 | Jan. 1979, Soybeans | 10/04/78 | 10/20/78 | 34,050.00 | 33,975.00 | 75.00 |
| 10/78 | Dec. 1978, Silver | 10/04/78 | 10/20/78 | 29,550.00 | 29,450.00 | 100.00 |
| 10/78 | Dec. 1978, British pounds | 10/12/78 | 10/31/78 | 51,450.00 | 49,575.00 | 1,875.00 |
| 10/78 | Dec. 1978, IMM gold | 10/25/78 | 10/31/78 | 24,120.00 | 23,410.00 | 710.00 |
| 10/78 | Mar. 1979, IMM gold | 10/27/78 | 10/31/78 | 24,730.00 | 24,590.00 | 140.00 |
| 11/78 | Jan. 1979, Lumber | 11/04/78 | 11/06/78 | 20,400.00 | 20,000.00 | 400.00 |
| 11/78 | Jan. 1979, Soybean oil | 11/21/78 | 11/08/78 | 14,706.00 | 14,580.00 | 126.00 |
| 11/78 | Mar. 1979, IMM gold | 11/21/78 | 11/10/78 | 21,350.00 | 20,610.00 | 740.00 |
| 11/78 | Feb. 1979, Hogs | 11/16/78 | 11/28/78 | 15,705.00 | 15,480.00 | 225.00 |
| 11/78 | Feb. 1979, Cattle new | 11/16/78 | 11/28/78 | 23,140.00 | 22,940.00 | 200.00 |
| 11/78 | Feb. 1979, Cattle new | 11/16/78 | 11/28/78 | 23,220.00 | 23,030.00 | 190.00 |
| 11/78 | Mar. 1979, Japanese yen | 11/21/78 | 11/16/78 | 67,187.50 | 66,250.00 | 937.50 |
| 9/78 | Dec. 1979, Swiss francs | | 9/22/78 | (11) | (11) | 4,407.50 |
| | Total commodity gains before commission | | | [12]909,471.60 | 880,882.00 | 28,589.60 |

[8]"Selling price" means the market price of the underlying commodity that is the subject of a commodity futures contract, on the date of the sale of the commodity futures contract.

[9]"Cost" means the market price of the underlying commodity that is the subject of a commodity futures contract, on the date that the commodity futures contract is entered into.

[10]"Gain" or "loss" is the difference between the selling price and the cost, before fees and commissions.

[11]The missing selling price and cost figures are not in evidence.

[12]This figure was stipulated by the parties, although the addition is not arithmetically correct. See note 11.

NMT received $35,000 in cash payments, attributable to the sale of the Bernalillo land, and $125,000,[13] attributable to the sale of the Baca location during its taxable year ended April 30, 1979. NMT also sold a D7 cat tractor on September 21, 1978, for $9,600 in cash, and office furniture for $40 in cash. The total of such items, other than interest, was $149,140. NMT had passive investment income in the amount of $92,726 during its taxable year ended April 30, 1979.[14]

All of the aforesaid transactions were reported on Form 1120S, U.S. Small Business Corporation Income Tax Return, for NMT's taxable year ended April 30, 1979. NMT was completely liquidated and dissolved in 1982.

Respondent determined, in his statutory notices of deficiency, that NMT derived "gross receipts," within the meaning of section 1372(e)(5), from its commodity futures transactions in the amount of $28,590—the difference between the contract price of the commodity futures contracts entered into by NMT in order to close or offset its open positions ($909,471.60) and the contract price of the commodity futures contracts ($880,882), rounded to the nearest dollar—during its taxable year ended April 30, 1979. Based upon the aforesaid interpretation of "gross receipts," within the meaning of section 1372(e)(5), respondent determined that NMT had gross receipts for its taxable year ended April 30, 1979, more than 20 percent of which was passive investment income.[15] Respondent, con-

---

[13]Payment of principal with respect to the sale of the Baca location amounted to $104,500; $20,500 was interest.

[14]Computed as follows:

| | |
|---|---:|
| Interest on U.S. obligations | $953 |
| Other interest | 90,012 |
| Oil royalties | 1,761 |
| Total | 92,726 |

The $90,012 of "other interest" includes the portion of the installment payment on the sale of the Baca location attributable to interest ($20,500).

[15]The computation is as follows:

*Gross receipts*:

| | |
|---|---:|
| Principal collections—installment sale (Baca location) | $104,500 |
| Principal collections—installment sale (Bernalillo land) | 35,000 |
| Sale of D7 cat tractor | 9,600 |
| Sale of office furniture | 40 |
| Commodity futures transactions—gains before commissions | 28,590 |
| Interest on U.S. obligations | 953 |
| Other interest | 90,012 |
| Oil royalties | 1,761 |
| Total gross receipts | 270,456 |

cluding that NMT's election to be taxed as a tax-option corporation under section 1372(a) was involuntarily terminated as of May 1, 1978, pursuant to the provisions of section 1372(e)(5), determined the deficiencies here in issue.

Included were respondent's determinations that: (1) NMT was a personal holding company in 1979; and (2) that the distributions of $100,000 and $197,844 that T.P. received from NMT during his taxable years ended December 31, 1979, and December 31, 1980, respectively, were taxable dividends under sections 301 and 316. The parties do not address the above-mentioned determinations directly, but have stipulated that: (1) Should this Court determine that "gross receipts," within the meaning of sec. 1372(e)(5), equals the amount realized by a small business corporation trading in commodity futures contracts, as contended by petitioners, the statutory notices of deficiency are erroneous as to all matters for all years in issue, and; (2) should this Court determine that "gross receipts," within the meaning of sec. 1372(e)(5), includes only gains from transactions in commodity futures contracts, unreduced by any fees or commissions, as contended by respondent, the statutory notices of deficiency are correct as to all matters for all years in issue. The parties agreed, further, that the issue herein is to be decided on the facts and the law as they existed in NMT's taxable year ended April 30, 1979.

### ULTIMATE FINDING OF FACT

In its taxable year 1979, NMT had gross receipts less than 20 percent of which constituted passive investment income.

### OPINION

Petitioners contend that "gross receipts," within the meaning of section 1372(e)(5), derived by a small business corporation from commodity futures transactions include the full

---

*Passive investment income:*

| | |
|---|---|
| Interest on U.S. obligations | $953 |
| Other interest | 90,012 |
| Oil royalties | 1,761 |
| Total passive investment income | 92,726 |

Passive investment income ($92,726) is more than 20 percent of gross receipts ($270,456), or $54,091.20.

amount realized from such transactions, viz, the contract price of the offsetting futures contracts.

Respondent determined, in his notices of deficiency, that gross receipts from commodity futures transactions equal the amount of gain resulting from the difference between the total contract prices of the offsetting short positions and the total contract prices of the long positions, unreduced by any fees or commissions.[16]

The issue before us appears to be one of first impression in the Federal courts, including this Court.

Commodity futures contracts are executory contracts that encompass both rights and obligations with respect to property. *Covington v. Commissioner*, 42 B.T.A. 601 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941), cert. denied 315 U.S. 822 (1942). A commodity futures contract does not represent the commodity itself, but rather the right to acquire the specific commodity. *Modesto Dry Yard, Inc. v. Commissioner*, 14 T.C. 374 (1950). The person initiating a commodity futures contract acquires either the right and obligation to purchase the underlying commodity in the future (a long position) or the right and obligation to sell the underlying commodity in the future (a short position), in each case, at a fixed price. A long or short commodity futures position is acquired when a long or short position is traded by a broker over a recognized commodity exchange and recorded on the exchange's books. *Smith v. Commissioner*, 78 T.C. 350 (1982); see *Valley Waste Mills v. Page*, 115 F.2d 466 (5th Cir. 1940), cert. denied 312 U.S. 681 (1941); *Maloney v. Commissioner*, 25 T.C. 1219 (1956). In order for a party to a commodity futures contract to terminate the contractual rights and obligations prior to delivery, a closing or setoff transaction is required.[17] Settlement of a commodity futures contract by offset constitutes a sale or exchange of the original commodity futures contract. *Vickers v. Commissioner*, 80 T.C. 394 (1983); *Covington v. Commissioner, supra*; see

---

[16]Based upon the aforesaid interpretation of "gross receipts," within the meaning of sec. 1372(e)(5), respondent determined that NMT's election under sec. 1372(a) was involuntarily terminated as of May 1, 1978, pursuant to sec. 1372(e)(5), because NMT had gross receipts for its taxable year ended Apr. 30, 1979, more than 20 percent of which was passive investment income. See Rev. Rul. 79-294, 1979-2 C.B. 305, which states respondent's position on this issue.

[17]A closing or offsetting transaction involves the acquisition of either a long position (if the trader wishes to liquidate a short position) or a short position (if the trader wishes to liquidate a long position) covering the same amount of a specified commodity and the same delivery month.

*Hoover Co. v. Commissioner*, 72 T.C. 206 (1979); *Battelle v. Commissioner*, 47 B.T.A. 117 (1942). Accordingly, gain or loss is sustained at the time of settlement of a commodity futures contract by offset.[18] See *Smith v. Commissioner, supra.*

The amount realized from the sale or other disposition of property is the sum of any money received plus the fair market value of the property (other than money) received. Sec. 1001(b); sec. 1.1001–1(a), Income Tax Regs. The amount of gain or loss realized from the settlement of a commodity futures contract by offset is the difference between the contract price of the offsetting short (if a long position was originally entered into), or long (if a short position was originally entered into) position and the contract price of the original commodity futures contract.[19]

Section 1372(a) provides for an election, available to eligible small business corporations, not to be subject to the taxes imposed by chapter 1,[20] but to have all its income taxed directly to its shareholders. Once validly made, such election is effective for the taxable year of the corporation for which it is made and for all succeeding taxable years of the corporation unless it is terminated or revoked under section 1372(e). Sec. 1372(d). Section 1372(e)(5) provides, in pertinent part, as follows:

(5) PASSIVE INVESTMENT INCOME.—

(A) Except as provided in subparagraph (B), an election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is passive investment income. Such termination shall be effective for the taxable year of the

---

[18]NMT did not sustain any losses as a result of its trading in commodity futures contracts, only gains.

[19]For example, on Sept. 20, 1978, NMT entered into a contract to accept delivery of IMM gold in December 1978 (long position). The price per ounce of gold as of this date was $218; the contract involved 100 ounces. The price per ounce of gold on Oct. 20, 1978, was $229.80, and NMT on that date entered into a contract to deliver IMM gold in December 1978 at $229.80 per ounce (short position). The acquisition of a short position in the same commodity for the same delivery month, viz, the entering into an offsetting short contract, constitutes a sale or exchange in which a gain of $1,180 was realized, as follows: amount realized is the contract price of the short contract ($22,980) less the contract price of the long contract ($21,800), equals gain of $1,180 before fees or commissions.

[20]These taxes include the regular corporate income tax, the accumulated earnings tax, and the personal holding company tax. However, pursuant to sec. 1372(b), an electing small business corporation which realizes capital gains may be subject to the special capital gains tax imposed by sec. 1378 and the minimum tax of secs. 56 and 58(d)(2).

corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

*    *    *    *    *    *    *

(C) For purposes of this paragraph, the term "passive investment income" means gross receipts derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of the gains therefrom). * * *

The subchapter S provisions do not contain a definition of the term "gross receipts." Section 1.1372–4(b)(5)(iv), Income Tax Regs., defines gross receipts as follows:

The term "gross receipts" as used in section 1372(e) is not synonymous with "gross income." The test under section 1372(e)(4) and (5) shall be made on the basis of total gross receipts, except that, for purposes of section 1372(e)(5), gross receipts from the sales or exchanges of stock or securities shall be taken into account only to the extent of the gains therefrom. The term "gross receipts" means the total amount received or accrued under the method of accounting used by the corporation in computing its taxable income. Thus, the total amount of receipts is not reduced by returns and allowances, cost, or deductions. For example, gross receipts will include the total amount received or accrued during the corporation's taxable year from the sale or exchange (including a sale or exchange to which section 337 applies) of any kind of property, from investments, and for services rendered by the corporation. However, gross receipts does not include (1) amounts received in nontaxable sales or exchanges (other than those to which 337 applies), except to the extent that gain is recognized by the corporation, (2) amounts received as a loan, as a repayment of a loan, as a contribution to capital, or on the issuance by the corporation of its own stock, or (3) certain amounts which are treated under section 331 (relating to corporate liquidations) as payments in exchange for stock (see subdivision (xi) of this subparagraph).

Section 1372(e)(5) was enacted as part of section 64, Technical Amendments Act of 1958, Pub. L. 85–866, 72 Stat. 1606, 1652 (1958), which amended chapter 1 by adding subchapter S, composed of sections 1371 through 1377.[21] As originally enacted in 1958, section 1372(e)(5) provided as follows:

---

[21]In 1954, President Eisenhower recommended the passage of legislation which would eliminate the influence of Federal tax laws on the selection of the form of organization adopted by small businesses. President's Budget Message of Jan. 21, 1954, 100 Cong. Rec. 567, 571 (1954). In the same year, the Senate acted upon the President's proposal; sec. 1351 of the bill passed by the Senate would have allowed certain corporations to be taxed as partnerships and certain proprietorships and partnerships to be taxed as corporations. The companion bill reported by the House Ways and Means Committee did not contain any such provision and the Conference

(5) PERSONAL HOLDING COMPANY INCOME.—An election under subsection (a) made by a small business corporation shall terminate if, for any taxable year of the corporation for which the election is in effect, such corporation has gross receipts more than 20 percent of which is derived from royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains therefrom). Such termination shall be effective for the taxable year of the corporation in which it has gross receipts of such amount, and for all succeeding taxable years of the corporation.

Subsection (a) of section 3 of the Act of April 14, 1966, Pub. L. 89–389, 80 Stat. 114–115, amended section 1372(e)(5) by changing the heading of paragraph (5) from "Personal holding company income" to "Passive investment income," and by dividing the paragraph into subparagraphs (A), (B), and (C).[22]

Respondent does not contend that gross receipts from dealing in commodities futures are passive investment income for purposes of section 1372(e)(5).[23] Rather, respondent's con-

---

Committee approved only the provision allowing proprietorships and partnerships to elect to be taxed as corporations. Conf. Rept. 2543, 83d Cong., 2d Sess. 72 (1954). In 1958, President Eisenhower again recommended that Congress adopt certain tax provisions to help small businesses. President's Budget Message of Jan. 13, 1958, 104 Cong. Rec. 388, 389 (1958). In the same year, the Treasury Department drafted provisions for the consideration of the House Ways and Means Committee. The House Committee did not adopt the Treasury's draft in any form. H. Rept. 775, 85th Cong., 1st Sess. (1957), 1958–3 C.B. 811. However, the Senate developed subch. S, which Congress adopted in the Technical Amendments Act of 1958. S. Rept. 1983, to accompany H.R. 8381 (Pub. L. 85–866), 85th Cong., 2d Sess. (1958), 1958–3 C.B. 922, 1008.

[22]Subsec. (b) of sec. 3 of the Act of Apr. 14, 1966, Pub. L. 89–389, 80 Stat. 111, 114, made the amendment in subsec. (a) generally applicable to taxable years of electing small business corporations ending after the date of enactment of the act.

[23]Sec. 1372(e)(5)(C) provides that the term "passive investment income" means six types of gross receipts. The term "means" indicates an exclusive list. The sole type of income which can reasonably be considered to include commodity futures transactions is gross receipts derived from sales or exchange of stock or securities. Sec. 1.543–1(b)(5)(i), Income Tax Regs., defines stock or securities. Sec. 1.543–1(b)(5)(i), Income Tax Regs., is applied to subch. S by sec. 1.1372–4(b)(5)(x), Income Tax Regs. Sec. 1.543–1(b)(5)(i), Income Tax Regs., provides in pertinent part, as follows:

"The term 'stock or securities' as used in section 543(a)(2) and this subparagraph includes shares or certificates of stock, stock rights or warrants, or interest in any corporation (including any joint stock company, insurance company, association, or other organization classified as a corporation by the Code, certificates of interest or participation in any profit sharing agreement, or in any oil, gas, or other mineral property, or lease, collateral trust certificates, voting trust certificates, bonds, debentures, certificates of indebtedness, notes, car trust certificates, bills of exchange, obligations issued by or on behalf of a State, Territory, or political subdivision thereof."

Thus, commodity futures contracts are not stock or securities. Rev. Rul. 71–568, 1971–2 C.B. 312, so holds. See also Rev. Rul. 72–457, 1972–2 C.B. 510 (income derived by an electing small business corporation from the buying and selling of commodity futures is not passive investment income within the meaning of sec. 1372(e)(5)); *Corn Products Refining Co. v. Commissioner*, 215 F.2d 513 (2d Cir. 1954), affg. on this issue 16 T.C. 395 (1951), affd. on another ground 350 U.S. 46 (1955) (commodity futures do not constitute stock or securities within the meaning of the wash sale provisions of the Code—currently sec. 1091).

tention is that section 1372(e)(5) requires that only the gains realized by a small business corporation from its commodity futures transactions be included in determining whether the corporation had gross receipts more than 20 percent of which constitute passive investment income. Respondent argues, in support of his contention, that: (1) The legislative history of section 1372(e)(5) and the Federal statutory scheme in subchapter S indicate that only gains from commodity futures transactions were intended by Congress to be used in computing gross receipts;[24] (2) the intent that only gains from these transactions be included is evidenced by the parenthetical "(gross receipts from such sales or exchanges being taken into account for purposes of this paragraph only to the extent of gains)" in section 1372(e)(5)(C); (3) NMT's primary purpose in trading in commodity futures was to avoid the automatic termination provision in section 1372(e)(5); (4) NMT's monetary obligation and risk and loss with respect to its commodity futures transaction was limited to the amount of the margin deposits, and not to the full amount of the contract price of the commodity futures contract, thus the amount realized is only the gain ($28,589.60) excluding the "debt relief" (total contract prices of original commodity futures contracts, $880,882).

Respondent's arguments are not supported by the scant legislative history of the subchapter S provisions. Section 1372(e)(5) was amended in 1966 by section 3(a) of Pub. L. 89–389, 80 Stat. 111, 114, which changed the title of the aforesaid section from "Personal holding company income" to

---

[24]Respondent's reasoning is as follows: (1) Sec. 351 of the Revenue Act of 1934, 48 Stat. 680, 751, imposed a special tax on undistributed profit of personal holding corporations, defined as corporations 80 percent of whose gross income for the taxable year consisted of royalties, dividends, interest, annuities, and (except in the case of regular dealers in stock or securities) gain from the sale or exchange of stock or securities, and whose stock to the extent of more than 50 percent in value was owned by not more than five individuals at any time during the last half of the taxable year; (2) in order that individuals could not take advantage of the personal holding company provisions so as to reduce their taxes, sec. 1 of the Revenue Act of 1937, 50 Stat. 813, was enacted, adding new sec. 353 (the predecessor of sec. 543), which included as personal holding company income the gains from commodity futures transactions on or subject to the rules of boards of trade and exchanges (an exception was made in the case of gains on bona fide hedging transactions derived by corporations engaged in producing, processing, merchandising, or handling such commodities). This provision was included as sec. 502(c) of the 1939 Code; it was further enacted as sec. 543(a)(3) of the 1954 Code; and (3) at the time sec. 1372(e)(5) was enacted in 1958, the aforesaid version of sec. 543(a)(3) (including commodity gains within the definition of "personal holding company income") was in effect. Thus respondent concludes, in entitling 1372(e)(5) "Personal holding company income" in 1958, Congress expected and anticipated that only the gains from commodity futures transactions would be included for purposes of computing gross receipts from the closing or setoff of commodity futures contracts.

"Passive investment income." Thus, even if respondent is correct that the original version of section 1372(e)(5) intended to incorporate by reference the provisions of the Code referring to the personal holding companies, the amendment of section 1372(e)(5) by section 3(a) of Pub. L. 89–389, 80 Stat. 111, 114, changing the heading of paragraph (5), constitutes a calculated effort by Congress to erase utterly any implication that a small business corporation must be a personal holding company before it can be excluded from subchapter S treatment by section 1372(e)(5). See *Marshall v. Commissioner*, 510 F.2d 259 (10th Cir. 1975), affg. 60 T.C. 242 (1973). Section 543 was also amended by section 225(d) of the Revenue Act of 1964, Pub. L. 88–272, 78 Stat. 19, 81, which deleted the provisions of paragraph (3) of subsection (a), including gains from commodity futures transactions within the definition of personal holding company income, from the definition of personal holding company income.

Respondent's contention that the parenthetical in section 1372(e)(5)(C) requires that only gains from commodity futures transactions be included as "gross receipts," is also meritless. The aforesaid parenthetical, by its terms, refers exclusively to sales or exchanges of stock or securities.[25]

Respondent contends, further, that NMT became a trader in commodity futures in order to avoid the automatic termination provision of 1372(e)(5). NMT, respondent's argument goes, was an active lumber corporation in the lumber business until 1976, when it decided to fully liquidate and cease its active business, and sold substantial portions of its assets under the installment method provisions of section 453. NMT found it advantageous, from a tax standpoint, to maintain its subchapter S status until the final installment payments from the sale of its assets were received. NMT's transactions in commodity futures contracts provided a source of nonpassive investment income necessary to avoid termination of its subchapter S corporation status under section 1372(e)(5).

The spell of the "active" trade of business requirement has been invoked, in the context of the subchapter S provisions, on innumerable occasions.[26] See, e.g. *Buono v. Commissioner*, 74

---

[25]Commodity futures contracts are not stock or securities. See note 22 *supra.*

[26]In support of this argument, the legislative history of the subch. S provisions, specifically S. Rept. 1007, 89th Cong., 2d Sess. (1966), 1966–1 C.B. 532, which states that the subch. S provisions

T.C. 187 (1980); *Marshall v. Commissioner, supra*; *Howell v. Commissioner*, 57 T.C. 546 (1972); *Buhler Mortgage Co. v. Commissioner*, 51 T.C. 971 (1969), affd. per curiam 443 F.2d 1362 (9th Cir. 1971). Section 1372(e)(5) requires the application of an objective test in determining whether a small business corporation's election under section 1372(a) has been terminated.[27] Although we agree with respondent that the subchapter S provisions were not intended to include corporations with large amounts of investment-type income (as opposed to those actively engaging in a trade or business), we also think that the standard used by the Code and the regulations does not permit us to look behind the normal characterization of a corporation's receipts in order to classify them as active or passive. See *Buhler Mortgage Co. v. Commissioner, supra*. Section 1372(e)(5) clearly specifies the types of potentially disqualifying passive investment income; gross receipts from transactions in commodity futures contracts are not among them. Furthermore, this Court has previously held that there is nothing unique or improper about a corporation engaging in exclusively investment activity, including under this rubric a subchapter S corporation. *Buono v. Commissioner, supra*; *Howell v. Commissioner, supra*. "[I]t has been black letter law ever since *Moline Properties, Inc. v. Commissioner*, 319 U.S. 436 (1943), that a corporation is, almost by definition, an entity engaged in 'business activity.' " *Buono v. Commissioner*, 74 T.C. at 197.

Finally, respondent argues that Merrill Lynch, not NMT, was primarily obligated for any losses sustained in NMT's commodity account; that liability or debt potential as a trader was limited on any day before the delivery month with respect to each commodity contract to the margin call on that particular day, and not to the purchase price of the futures contract. Thus, when NMT closed out a futures contract by entering into an offsetting position, it was not relieved of any real and present debt includable in its amount realized.

---

were passed to allow only small businesses actively engaged in a trade or business to make the election, is usually relied upon. Those businesses with large amounts of passive income were not to have the option of electing subch. S treatment. Consequently, Congress denied the election to those corporations which had large amounts of investment type income such as royalties, rents, dividends, annuities, and profits from the sales or exchanges of stock and securities.

[27]Respondent stipulated that NMT decided to attempt to make profits by trading in commodity futures contracts.

The parties stipulated, and we found as a fact, that when a commodity futures contract is entered into, the parties commit themselves to deliver, and accept delivery of, or to accept delivery of, and deliver, a specified commodity during a designated delivery month, and at a specified price. In order to acquire the contractual rights and incur the obligations in a futures transaction, an initial margin deposit is generally required. Should the trader's equity drop,[28] an additional margin call may be issued by the broker in order to restore the equity percentage to the specified level. This in no way alters a trader's rights and obligations with respect to the commodity futures contract. It is clear from the record that NMT was ultimately responsible to Merrill Lynch for any losses incurred in its commodity futures transactions.

Therefore, when commodity futures contracts are settled by offset, the contract price of the offsetting position, as determined by the market value of the underlying commodity, constitutes the amount realized, without being limited to the amount of gain. Thus, "gross receipts," within the meaning of section 1372(e)(5), means the *total* amount received or accrued by the corporation under its method of accounting in computing its taxable income without reduction for fees or commissions, and not simply gains, as contended by respondent.[29] We accordingly decide the issue presented in favor of petitioners and, as the parties have stipulated, it results from this that respondent's various determinations against petitioners were in error.

In order to allow the parties to submit computations as to the amount of the overpayment that is due to the petitioners,[30]

*Decision will be entered under Rule 155.*

---

[28]For example, where the trader acquires a long position and the price of the underlying commodity falls.

[29]Both parties discuss the rationale of our decision in *Smith v. Commissioner,* 78 T.C. 350 (1982), in extenso. In *Smith v. Commissioner, supra,* we dealt with the deductibility of losses incurred in silver tax straddle transactions. Thus, the facts of *Smith v. Commissioner, supra,* are distinguishable and merit no further discussion here.

[30]In their petition herein, petitioners alleged that they paid in full the deficiencies determined by respondent after the issuance of the statutory notices herein, but prior to the filing of the petition, and accordingly prayed for the entry of a decision finding an overpayment of taxes in such amounts. In his answer, respondent denied petitioners' allegations "for lack of knowledge." The record is otherwise silent. The parties should be able to agree on this matter as part of an agreed recomputation to be presented to the Court under Rule 155. If not, further proceedings under Rule 155 may be necessary.