WHITE'S FERRY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
White's Ferry v. Commissioner
Docket Nos. 19204-90, 25984-91
United States Tax Court
T.C. Memo 1993-639; 1993 Tax Ct. Memo LEXIS 650; 66 T.C.M. (CCH) 1855; December 29, 1993, Filed *650 For petitioner: Rex L. Sturm and R. Edwin Brown. For respondent: Sandra M. Jefferson. SWIFT
SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: Respondent determined a deficiency of $ 86,549 (including $ 2,981 in personal holding company tax) in petitioner's (White's Ferry) corporate Federal income tax for White's Ferry's taxable year ending March 31, 1987, and respondent determined that White's Ferry is liable for passive investment income taxes of $ 32,299 and $ 19,318, respectively, on net passive investment income for its short taxable year beginning April 1, 1987, and ending December 31, 1987, and for 1988. Respondent also determined that White's Ferry is liable for additions to tax under section 6661. After settlement of some issues, the issues remaining for decision are as follows: (1) Whether a distribution of real property to two of White's Ferry's shareholders in redemption of all of their stock constituted a nontaxable distribution in partial liquidation of White's Ferry; (2) whether White's Ferry should be treated as a personal holding company for its taxable year ending March 31, 1987; (3) whether a $ 75,000 payment to one of White's Ferry's shareholders *651 constituted a deductible payment of compensation for services rendered; and (4) whether White's Ferry is liable for additions to tax under section 6661. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT At the time the petition was filed, White's Ferry's principal place of business was in Rockville, Maryland. In 1948, White's Ferry was organized as a Maryland corporation. White's Ferry was organized for the primary purpose of providing passenger and automobile ferry service across the Potomac River between Montgomery County, Maryland, and Loudoun County, Virginia, approximately 40 miles northwest of Washington, D.C. The ferry crossing represents the only place between the Cabin John Bridge in Montgomery County, Maryland, and the Potomac River Bridge in Point of Rocks, Maryland, at which a motor vehicle can cross the Potomac River. The first ferry owned by White's Ferry and used to provide ferry service across the Potomac River was called the General Jubal Early, after General Jubal Early, who during the Civil *652 War led 14,000 Confederate troops across the Potomac River at the current site of the ferry. The ferry service is generally available daily from 5 a.m. to midnight or later, 7 days a week, on a year-round basis. From April 8, 1954, until December 29, 1986, Lucas D. Phillips, William R. Altizer, and R. Edwin Brown each owned one-third of the shares of stock in White's Ferry. Mr. Phillips served as president of White's Ferry, Mr. Altizer served as vice president, and Mr. Brown served as secretary. White's Ferry owns a 2-acre parcel of real property adjacent to the Potomac River in Montgomery County, Maryland, on which ferry operations are conducted and on which are located a loading and unloading area for passengers and motor vehicles, a building containing a general store, several employee apartments, and a garage that is used as a storage facility. White's Ferry leases from the National Park Service a 15-acre parcel adjacent to the 2-acre parcel that is used as a picnic area and as a parking lot. White's Ferry also leases from the National Park Service a parcel of real property adjacent to the Potomac River on the Virginia side of the river that is used as a loading and unloading *653 area for passengers and motor vehicles that are transported on the ferry across the river. On May 23, 1977, in connection with the ferry service, White's Ferry entered into an operating agreement with Montgomery Realty and Investment Corp., Inc. (Montgomery Realty), a corporation wholly owned by Mr. Brown and his son Herbert O. Brown (Herbert). [1] Under the operating agreement, Montgomery Realty was to run day-to-day operations of the ferry service. The operating agreement provided that from the monthly gross receipts generated by the ferry service White's Ferry was to receive $ 2,500, and Montgomery Realty was to retain the remainder of the receipts less operating expenses. White's Ferry's share of the monthly gross receipts from the ferry service, however, was to be reduced by $ 100 for each day in excess of 20 days per year that the ferry did not operate. This operating agreement with Montgomery Realty continued until January 1, 1987. *654 On November 6, 1979, Mr. Altizer died. Mr. Altizer's wife, Thelma V. Altizer, inherited Mr. Altizer's stock in White's Ferry, and Mrs. Altizer subsequently was elected vice president of White's Ferry. On August 20, 1981, the operating agreement between White's Ferry and Montgomery Realty was amended to reduce White's Ferry's share of the monthly gross receipts from the ferry service to $ 1,500 per month. The agreement remained the same in all other respects. During the many years of operating the ferry, Mr. and Mrs. Altizer and Mr. Phillips generally were not involved in the operation of the ferry service. Mr. Brown, on the other hand, was continually involved in all aspects of the operation of the ferry service. During the years that the operating agreement with Montgomery Realty was in effect (namely, from May 23, 1977, to January 1, 1987), Mr. Brown, on behalf of White's Ferry, provided numerous services to White's Ferry with respect to the operation of the ferry service. Mr. Brown generally participated in all management decisions pertaining to the operation of the ferry. He would be present at the site of the ferry service at least twice a week. He planned and supervised *655 the construction of the building for the general store and the employee dwellings on the 2-acre parcel of real property in Montgomery County, Maryland. He handled the negotiations with the National Park Service regarding the real property leased by White's Ferry on both the Maryland and Virginia sides of the river. He hired and fired ferry operators. He supervised the maintenance of the ferry in compliance with U.S. Coast Guard regulations. He obtained insurance with respect to the ferry service, and he defended White's Ferry from claims brought against White's Ferry in connection with the operation of the ferry service. Whenever an emergency or breakdown occurred in the operation of the ferry service, because of his experience and expertise in the operation of the ferry, Mr. Brown would be summoned, and he would assist in supervising the repairs and in dealing with the emergency. Such an emergency, for example, might occur in the middle of the night when a Potomac River flood would threaten to wash away or damage the buildings or the ferry itself. Mr. Brown would meet at least once a week with his son Herbert to account for and to review the weekly receipts and expenses of *656 operating the ferry, and Mr. Brown handled the bookkeeping and filing of tax returns for White's Ferry. Mr. Brown was never compensated, by either White's Ferry or Montgomery Realty, for the numerous services that he provided to White's Ferry during the years the operating agreement with Montgomery Realty was in effect. Prior to December 29, 1986, in addition to the ferry service and related equipment, the buildings, the real property, and the real property leases, White's Ferry had acquired real property in Loudoun County, Virginia, consisting of the following: (1) A 2-acre parcel of real property within the city limits of Leesburg, Virginia, that was sold by White's Ferry sometime prior to December 29, 1987; (2) a 54-acre parcel zoned for use as a cemetery; (3) a 20-acre parcel of real property adjacent to the 54-acre parcel that was used as a prison camp during World War II; and (4) a 5-acre parcel of undeveloped real property on Hogback Mountain. Prior to his death on November 6, 1979, Mr. Altizer managed the parcels of real property that White's Ferry owned in Loudoun County, Virginia. Mr. Altizer's management duties included planning and supervising the construction of roads *657 connecting the parcels of real property to county roads, bookkeeping, and collecting rents. After Mr. Altizer's death, Mr. Phillips assumed the bookkeeping responsibilities relating to the real property. Mr. Phillips (a retired State court judge) was, however, in the process of winding down his law practice, and he generally did not aggressively seek to further develop or to rent the parcels of real property in Loudoun County, Virginia, and the parcels were only occasionally rented. Mrs. Altizer and Mr. Brown generally were not involved in the management of the parcels of real property in Loudoun County, Virginia. On December 23, 1986, Mrs. Altizer and Mr. Phillips executed an agreement with White's Ferry for White's Ferry to redeem all of their shares in White's Ferry. Under the redemption agreement, in exchange for redeeming their shares in White's Ferry, Mrs. Altizer and Mr. Phillips each received a cash payment from White's Ferry of $ 101,465, a 50-percent interest in the three parcels of real property owned by White's Ferry in Loudoun County, Virginia (the stated market value of these three parcels of real property was indicated in the redemption agreement to be $ 200,000), *658 and a 50-percent interest in a $ 100,000 note receivable held by White's Ferry. [2] The stock redemption, the payouts due, and the property transfers agreed to under the stock redemption agreement all occurred on December 29, 1986. Mr. Brown planned the stock redemption and drafted all of the necessary documents. From the date that the three parcels of real property in Loudoun County, Virginia, were distributed to Mrs. Altizer and to Mr. Phillips (namely, December 29, 1986), through the date of trial, White's Ferry neither purchased nor owned any real property except that relating to the operation of the ferry service. On December 30, 1986, White's Ferry's board of directors adopted a resolution to pay Mr. Brown $ 75,000 for the services rendered to White's Ferry by Mr. Brown in 1986 and in the preceding years. Also on December 30, 1986, Mr. Brown *659 was elected president and treasurer of White's Ferry, and Mr. Brown's son, Malcolm E. D. Brown (Malcolm) was elected vice president and secretary. On December 31, 1986, Mr. Brown was paid the $ 75,000 mentioned above. On January 1, 1987, White's Ferry terminated the operating agreement with Montgomery Realty, and White's Ferry entered into a new operating agreement with Siddhartha, Inc. (Siddhartha), a corporation wholly owned by Mr. Brown's son, Malcolm. Under the new operating agreement, Siddhartha agreed to perform essentially the same services with respect to the ferry service as those that had been performed by Montgomery Realty under the prior operating agreement (namely, running the day-to-day operations of the ferry service). Under the new operating agreement with Siddhartha, each month White's Ferry was to receive $ 8,000 plus 5 percent of the monthly gross receipts generated by the ferry service, and Siddhartha was to retain the remainder of receipts less operating expenses. After the operating agreement between White's Ferry and Siddhartha was entered into, Mr. Brown, in his position as President of White's Ferry, continued to provide the same services with regard *660 to the operation of the ferry service, and Mr. Brown continued to actively participate in management decisions relating to the operation of the ferry service. On April 1, 1987, White's Ferry elected, pursuant to section 1362, to be treated for Federal income tax purposes as an S corporation. On White's Ferry's corporate Federal income tax return for its taxable year ending March 31, 1987, no capital gain with respect to the appreciation in the value of the three parcels of real property distributed to Mrs. Altizer and to Mr. Phillips was reported. Further, on White's Ferry's corporate Federal income tax return, the $ 75,000 paid to Mr. Brown on December 30, 1986, was deducted as salary. On White's Ferry's corporate Federal income tax return for its short taxable year beginning on April 1, 1987, and ending on December 31, 1987, gross receipts of $ 97,864 and regular C corporation retained or carryover earnings and profits of $ 54,799 were reported. On White's Ferry's corporate Federal income tax return for 1988, gross receipts of $ 115,928 and C corporation retained or carryover earnings and profits of $ 54,799 were reported. On audit, respondent determined that for White's Ferry's *661 taxable year ending March 31, 1987, the distribution of the three parcels of real property to Mrs. Altizer and to Mr. Phillips did not constitute a distribution in "partial liquidation" of the stock of White's Ferry under section 302(b)(4), and respondent therefore determined that White's Ferry was required to recognize capital gain with respect to the appreciation in the value of the three parcels of real property. Respondent also determined that the $ 75,000 payment to Mr. Brown constituted a dividend, not compensation, and respondent disallowed the claimed salary deduction therefor. Respondent also determined that the amounts received each year by White's Ferry under the operating agreements with Montgomery Realty and with Siddhartha constituted "rent" and that White's Ferry therefore was to be treated as a personal holding company and was liable for personal holding company taxes of $ 2,981 for its taxable year ending March 31, 1987. Further, respondent determined that (with respect to White's Ferry's earnings and profits that it retained and carried over from prior years in which it was a C corporation) White's Ferry was liable for passive investment income taxes of $ 32,299 *662 and $ 19,318, respectively, on its net passive investment income for its short taxable year beginning April 1, 1987, and ending December 31, 1987, and for 1988. OPINION Distribution of Property
Corporations generally must recognize gain on distributions of appreciated property to shareholders. Sec. 311(d)(1). Section 311(d)(2), however, as applicable to the year in issue, provides an exception for certain distributions of appreciated property that constitute, under section 302(b)(4), distributions in partial liquidation. Section 302(e), for purposes of section 302(b)(4), defines distributions in partial liquidation of a corporation as distributions that are, among other things, "not essentially equivalent to a dividend". The evaluation of whether distributions are "not essentially equivalent to a dividend" is made at the corporate level. Sec. 302(e)(1)(A). Section 302(e) was enacted in 1982 to replace former section 346(a)(2). Tax Equity and Fiscal Responsibility Act of 1982 (TEFRA), Pub. L. 97-248, sec. 222, 96 Stat. 324, 478-482. Section 302(e) contains essentially the same language as the language in former section 346(a)(2), and the legislative history of TEFRA *663 explicitly indicates that the definitions of "partial liquidation" and of "not essentially equivalent to a dividend" under former section 346(a)(2) are to apply under section 302(e). H. Conf. Rept. 97-760 (1982), 1982-2 C.B. 600, 628. Under former section 346(a)(2), distributions that were treated as "not essentially equivalent to a dividend" and therefore as nontaxable partial liquidations were those distributions that resulted in or caused a contraction of a corporation's business activity. Mains v. United States, 508 F.2d 1251, 1255 (6th Cir. 1975); Ballenger v. United States, 301 F.2d 192, 195 (4th Cir. 1962); Krauskopf v. Commissioner, T.C. Memo. 1984-386; Viereck v. United States, 3 Cl. Ct. 745, 760 (1983); S. Rept. 1622, 83d Cong., 2d Sess. (1954) (discussing the definition of corporate distributions in partial liquidation under former section 346(a)(2)); sec. 1.346-1(a)(2)(iii), Income Tax Regs.
In general, in order to qualify as a contraction of a corporation's business activity, under former section 346(a)(2), distributions *664 of property to the corporation's shareholders must cause a substantial reduction in the capital committed to the corporation's business and a corresponding reduction in the corporation's business activities to which the distributed property related. Mains v. United States, supra at 1255; Ballenger v. United States, supra at 195; Krauskopf v. Commissioner, supra; Viereck v. United States, supra at 760; sec. 1.346-1(a)(2)(iii), Income Tax Regs.; Rev. Rul. 82-187, 1982-2 C.B. 80; see also Imler v. Commissioner, 11 T.C. 836, 841 (1948). The December 29, 1986, distribution of White's Ferry's real property that was located in Virginia to two of its shareholders in redemption of their stock resulted in a significant reduction in the assets and capital of White's Ferry (and respondent does not contend otherwise). Respondent contends, however, that the distribution of the real property did not result in a reduction in White's Ferry's business activity and therefore that it did *665 not constitute a distribution in partial liquidation, but rather a taxable dividend. We disagree. Ownership and management of the Virginia real property constituted a business activity of White's Ferry, albeit a minor one. The property was occasionally rented. Another parcel had been sold for a significant profit. Managing the real property was the sole corporate activity that occupied the time and attention of two of the three shareholders. Based on the record before us, we conclude that the distribution of White's Ferry's real estate to two of White's Ferry's shareholders in redemption of their stock resulted in a significant contraction in the capital and the business activity of White's Ferry, that the distribution was not essentially equivalent to a dividend, and that the distribution constituted, under section 302(e), a nontaxable distribution in partial liquidation of White's Ferry. Personal Holding Company
With respect to C corporations and therefore with respect to White's Ferry's taxable year ending March 31, 1987, in addition to the regular corporate income tax, section 541 imposes a special "passive investment income tax" on corporations that are treated as *666 personal holding companies under section 542. Pleasant Summit Land Corp. v. Commissioner, 863 F.2d 263, 269 (3d Cir. 1988), affg. in part, revg. in part and remanding T.C. Memo. 1987-469; Condor Intl., Inc. v. Commissioner, 98 T.C. 203, 219 (1992). The passive investment income tax is equal to 50 percent of the corporation's undistributed "personal holding company income". Sec. 541; Rod Warren Ink v. Commissioner, 92 T.C. 995, 997 (1989), revd. on other grounds 912 F.2d 325 (9th Cir. 1990). Under section 542(a)(1), C corporations are to be treated as personal holding companies if both of the following occur: (1) Sixty percent or more of the corporation's annual "ordinary gross income" (as adjusted in accordance with the rules under section 543(b)(2)) constitutes "personal holding company income"; and (2) more than 50 percent of the corporation's stock is owned by five or fewer shareholders at any time during the last half of the taxable year. Pleasant Summit Land Corp. v. Commissioner, supra at 269; *667 Dothan Coca-Cola Bottling Co. v. United States, 745 F.2d 1400, 1401 (11th Cir. 1984); Condor Intl., Inc. v. Commissioner, supra at 219. Under section 543(b)(2) "ordinary gross income" includes all of a corporation's gross income except gains from the sale of capital assets and of section 1231(b) property (i.e., of property used in a taxpayer's trade or business). Sec. 543(b)(1). With respect to S corporations and therefore with respect to White's Ferry's short taxable year beginning April 1, s11 1987, and ending December 31, 1987, and with respect to 1988, under section 1363(a), S corporations generally are not subject to Federal income taxation at the corporate level. New Mexico Timber Co. v. Commissioner, 84 T.C. 1290, 1301 (1985). Section 1375(a), however, imposes a passive investment income tax directly on S corporations that have retained earnings and profits at the end of a year carried over from a prior year in which the S corporations had been C corporations and in which year they had realized "passive investment income" in excess of 25 percent of annual gross receipts. For *668 purposes of C corporations and their liability for passive investment income tax under section 542 and for purposes of S corporations and their liability for carryover passive investment income tax under section 1375, "personal holding company income" includes, among other things, rents, sec. 543(a), and "passive investment income" includes, among other things, rents, sec. 1362(d)(3)(D); Bradshaw v. United States, 231 Ct. Cl. 144, 683 F.2d 365, 378 (1982); New Mexico Timber Co. v. Commissioner, supra at 1301-1302. Generally, for purposes of both sections 543 and 1362, "rent" is defined as amounts received "for the use of, or right to use, property" (whether real or personal) of the corporation. Secs. 543(b)(3), 1372(e)(5)(C) (the predecessor to section 1362 containing essentially the same language found in section 1362(d)(3)(D)); Crouch v. United States, 692 F.2d 97, 100-101 (10th Cir. 1982); sec. 1.1372-4(b) (5), Income Tax Regs.
In determining, for Federal income tax purposes, whether amounts received constituted rent (and whether the underlying arrangement forms a *669 lessor-lessee relationship), the substance of the transaction and not the form of the contract or agreement is controlling. Oblinger Trust v. Commissioner, 100 T.C. 114, 118-119 (1993); Amerco v. Commissioner, 82 T.C. 654, 670 (1984); Nigh v. Commissioner, T.C. Memo. 1990-349; see also Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 95 (4th Cir. 1985), affg. in part, revg. in part and remanding 81 T.C. 184 (1983). Respondent argues that use of the words "lease" and "rent" in the operating agreements between White's Ferry and Montgomery Realty and Siddhartha and in other relevant documents in this case establishes that White's Ferry's relationships with Montgomery Realty and with Siddhartha constituted lessor-lessee relationships and that the amounts received by White's Ferry from Montgomery Realty and from Siddhartha relating to the operation of the ferry service constituted rent and were in an amount sufficient to trigger the passive investment income tax on the retained earnings and profits of White's Ferry. We disagree. *670 The mere fact that White's Ferry, Montgomery Realty, and Siddhartha used words such as "lease" and "rent" in the context of the operating agreements between them is not controlling herein. Amounts received by White's Ferry from Montgomery Realty and from Siddhartha under the agreements did not constitute rent because Montgomery Realty and Siddhartha did not "use" the ferry in the capacity as lessees. Rather, the agreements between White's Ferry and Montgomery Realty and Siddhartha constituted joint operating agreements under which Mr. Brown and through him White's Ferry exercised substantial and continuing management control over the operation of the ferry service, which control is inconsistent with respondent's contention that a lessor-lessee relationship existed. See, e.g., Eller v. Commissioner, 77 T.C. 934, 955 (1981); Webster Corp. v. Commissioner, 25 T.C. 55, 60-61 (1955) (Court reviewed), affd. 240 F.2d 164 (2d Cir. 1957); Rev. Rul. 67-423, 1967-2 C.B. 221. In our Findings of Fact, we have detailed Mr. Brown's extensive and continuing involvement *671 in and management of the ferry service on behalf of White's Ferry. On the evidence before us, we conclude that the operation of the ferry service, in substance, constituted a joint effort between White's Ferry and Montgomery Realty and between White's Ferry and Siddhartha and the amounts received by White's Ferry from Montgomery Realty and from Siddhartha represented White's Ferry's share of the operating receipts from the joint operation of the ferry service. We so hold. In light of our conclusion that amounts received by White's Ferry from Montgomery Realty and from Siddhartha did not constitute rent, White's Ferry did not constitute a personal holding company under section 542 for its taxable year ending March 31, 1987, and White's Ferry is not liable for passive investment income taxes for the short year beginning April 1, 1987, and ending December 31, 1987, nor for 1988. $ 75,000 Payment to Mr. Brown
Section 162(a)(1) provides that in computing taxable income, taxpayers are entitled to deduct all ordinary and necessary expenses paid or incurred in connection with a trade or business, including a reasonable allowance for salaries or other compensation for personal services *672 rendered to the taxpayer. In order for payments to be deductible as compensation under section 162(a)(1), the payments must be made with an intent to compensate for services performed and the payments must be reasonable in amount. Wood v. Commissioner, 955 F.2d 908, 914 (4th Cir. 1992), revg. 95 T.C. 364 (1990); Whitcomb v. Commissioner, 733 F.2d 191, 193 (1st Cir. 1984), affg. 81 T.C. 505 (1983); King's Court Mobile Home Park v. Commissioner, 98 T.C. 511, 514 (1992); Paula Construction Co. v. Commissioner, 58 T.C. 1055 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); sec. 1.162-7(a), Income Tax Regs.
Whether payments are made with an intent to compensate for services performed and whether the payments are reasonable in amount are questions of fact. Whitcomb v. Commissioner, supra at 194; Paula Construction Co. v. Commissioner, supra at 1058-1059. In the instant case, the evidence is *673 clear as to the compensatory nature and the reasonableness of the $ 75,000 payment to Mr. Brown. Among other things, the testimony of Mr. Brown, Mr. Phillips, and Malcolm support the conclusion that the $ 75,000 payment was intended to compensate Mr. Brown in 1986 for the uncompensated and significant services Mr. Brown rendered to White's Ferry in 1986 and in prior years. The records of White's Ferry, such as the resolution adopted by White's Ferry's board of directors pertaining to the compensation of Mr. Brown, also support our conclusion. Respondent refers to a document that was drafted by Mr. Brown in 1983 that proposed to distribute to each of the three shareholders of White's Ferry a $ 75,000 dividend. We do not find this unexecuted, draft document to be particularly probative evidence of what was intended in 1986 when Mr. Brown was paid $ 75,000. We hold that the $ 75,000 paid to Mr. Brown in 1986 is deductible by White's Ferry as compensation under section 162(a)(1). Additions to Tax
As we have found for White's Ferry on each of the issues before us, we find for White's Ferry on the additions to tax. Decisions will be entered under Rule 155. Footnotes
1. Mr. Brown owned 81 percent and his son Herbert owned the remaining 19 percent of the stock of Montgomery Realty.↩
2. Sometime prior to Dec. 29, 1986, when White's Ferry sold the 2-acre parcel of real property in Leesburg, Virginia, White's Ferry acquired the $ 100,000 note receivable.↩